# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00488-CV

**William A. MacFarlane, Individually and as Trustee for the
MacFarlane 1995 Children's Trust, Appellant**

**v.**

**Daniel Nelson; Barry Bishop; and Clark, Thomas & Winters, P.C., Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. GN203906, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In this appeal, William A. MacFarlane contends that the trial court erred by granting directed verdicts in favor of attorneys Daniel Nelson and Barry Bishop, along with Bishop's firm, Clark, Thomas & Winters, P.C.,[1] whom MacFarlane had sued for legal malpractice.  Nelson and Bishop/Clark Thomas urge this Court to affirm the judgment on the basis that MacFarlane put forth no evidence of essential elements on each of his claims and, therefore, as a matter of law, the trial court properly directed the verdict.  *See* Tex. R. Civ. P. 268.  We affirm the judgment.

---

[1]  Because MacFarlane asserts identical claims against Bishop and Clark, Thomas & Winters, based on Bishop's actions on behalf of the firm, we will refer to them collectively as "Bishop/Clark Thomas."

## BACKGROUND

This case involves a complex series of business transactions and legal proceedings in which multiple attorneys represented MacFarlane and his business partner, Robert Rickard, along with the various entities operated by MacFarlane and Rickard. The relevant history, however, can be divided into two major components: events relating to Nelson's alleged breach of fiduciary duty and events relating to Bishop/Clark Thomas's alleged legal malpractice and breach. We will initially set forth a summary of the facts and then discuss each event in detail as it relates to the analysis of each issue.

In 1992, MacFarlane and Rickard became partners in the real estate and construction business, and Nelson represented their assorted entities. As their partnership relationship deteriorated, a meeting was held on April 29, 1999, to discuss the conflicts. Nelson was present at the meeting and subsequently drafted a settlement agreement reflecting what Rickard and MacFarlane agreed to at the meeting. Nelson also represented MacFarlane in an attempted purchase of a building known as "Steck I." Additionally, Nelson and Rickard entered a deal with MacFarlane where they agreed to pay him $150,000 in exchange for his promise to repay $175,000, which resulted in a foreclosure on a condominium unit owned by MacFarlane. MacFarlane asserts that Nelson breached his fiduciary duty in each of these three events—the April 29 meeting and resulting settlement agreement, the Steck I transaction, and the $150,000 transaction.

After signing the settlement agreement, MacFarlane refused to honor its terms. In July 2000, Rickard sued MacFarlane to enforce the agreement. MacFarlane hired Bishop/Clark Thomas to defend his attempt to rescind the agreement, which included a full release of all potential

2

claims against Rickard. The jury found in Rickard's favor, MacFarlane appealed, and this Court affirmed the judgment against him.[2] MacFarlane asserts that Bishop/Clark Thomas committed legal malpractice by negligently handling the Rickard suit and that Bishop/Clark Thomas breached their fiduciary duty by renegotiating MacFarlane's attorney's fees agreement on the eve of that trial.

In the instant trial, after MacFarlane and his trust rested their case, defendants Nelson and Bishop/Clark Thomas moved for directed verdicts pursuant to Rule 268. *See* Tex. R. Civ. P. 268. After considering the motions over the noon recess, the trial court announced its ruling:

> I conclude as a matter of law in this case that the plaintiffs [MacFarlane and his trust] haven't cleared that threshold [of putting forth sufficient evidence to get to a jury] . . . and I am going to grant the motion for directed verdict. . . . I am granting the motions as they were presented in full. . . . I will note for the record that I am especially persuaded by the argument on damages . . . but I am granting the entire motions.

MacFarlane now urges that the directed verdicts should be reversed because there is sufficient evidence to support each of his claims against Nelson and Bishop/Clark Thomas.

## ANALYSIS

**Standard of Review**

A trial court may direct the verdict when there is no evidence of any probative value that raises a genuine issue of material fact on the question presented. *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004). There are two situations in which a directed verdict

---

[2] *See MacFarlane v. Rickard*, No. 03-01-00507-CV, 2002 Tex. App. LEXIS 5421 (Tex. App.—Austin July 26, 2002, no pet.) (mem. op.). Bishop/Clark Thomas did not represent MacFarlane on appeal.

3

may be proper: where (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery, or (2) the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). If reasonable minds could draw only one legal conclusion from the evidence, then the court may direct the verdict; otherwise, if the evidence is such that reasonable minds could differ as to the correct outcome, then the question must go to the jury. *See Jones v. Tarrant County Util. Co.*, 638 S.W.2d 862, 865 (Tex. 1982) (citing *Collora v. Navarro*, 574 S.W.2d 65, 67 (Tex. 1978)).

In reviewing a directed verdict, we must view the evidence in a light most favorable to the non-moving party and disregard evidence that is contrary to the verdict. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex. 1986). As the Texas Supreme Court recently clarified, this means we must "[c]redit[] all favorable evidence that reasonable jurors could believe and disregard[] all contrary evidence except that which they could not ignore." *City of Keller v. Wilson*, No. 02-1012, 2005 Tex. LEXIS 436, at *53 (Tex. June 10, 2005).

## Issue 1: Claims Against Nelson

*April Meeting and Settlement Agreement*

In 1992, Nelson set up a partnership between MacFarlane and Rickard called Even Par, Ltd., for the purpose of investing in and developing real estate. Even Par purchased a waterfront condominium project called the Villas on Lake Travis ("the Villas"), which consisted of the "West Side" and "East Side" developments; condominiums were already built on the West Side, while plots were available for new construction on the East Side. MacFarlane and Rickard renovated the West Side condominiums and sold them for a profit of over a million dollars. They debated about what

4

to do with the East Side, ultimately deciding to contract with JMC Homes to build condominiums on that property.

In 1995, Nelson set up another entity for MacFarlane and Rickard, a limited partnership known as the Villas by Renaissance, Ltd. ("VBR"), for the purpose of constructing and selling the East Side units. Nelson also established Tuscany Properties, Inc.[3] to serve as the general, managing partner of VBR. MacFarlane and Rickard held equal partnership interests in VBR.[4]

After construction was started on the East Side units, MacFarlane suffered a stroke for which he spent approximately four months in rehabilitation. Thereafter, he began visiting the construction site again and noticed that there were problems with the construction. MacFarlane complained about these construction defects to Rickard, Nelson, Jennifer Ramsey, and Larry Richardson.[5] Although MacFarlane understood that Tuscany was the managing partner of VBR and that he and Rickard were "complete 50/50 partner[s]," he believed that the problems with VBR were the result of Rickard "mismanaging" the project. On April 29, 1999, MacFarlane, Rickard, Nelson, and Ramsey met at Nelson's office to discuss MacFarlane's complaints. After MacFarlane expressed his concerns, Rickard presented information about the financial status of VBR, and Nelson took notes of the discussion. At the end of the meeting, the parties agreed that Nelson would be

---

[3] Tuscany was owned 37.5% by MacFarlane, 37.5% by Rickard, and 25% by JMC Homes.

[4] The ownership of VBR was divided as follows: 7.125% by MacFarlane individually, 30% by MacFarlane as trustee, 27.125% by Rickard individually, 10% by Rickard as trustee, 24.75% by JMC Homes, and 1% by Tuscany.

[5] Jennifer Ramsey is another attorney who represented Rickard, MacFarlane, and their various entities in assorted matters. Larry Richardson is a builder who was hired to replace JMC Homes.

primarily responsible for drafting a settlement agreement reflecting what MacFarlane and Rickard had agreed to, and Ramsey would draft a mutual release to be included in the agreement. On May 5, 1999, Rickard and MacFarlane signed the agreement.[6]

Under the settlement agreement, MacFarlane received two of the East Side condominiums, units 190 and 191, at a price of $575,000 each, which reduced the amount MacFarlane owed on his land note to VBR by a total of $1.15 million, and he received $100,000 from VBR, paid in three installments.[7] He testified that this "looked like a great deal" because its overall result would allow MacFarlane to walk away from the partnership with approximately $475,000 more than Rickard. The agreement also contained a mutual release providing that each of the parties released one another "from any and all claims or causes of action . . . that they have or might have, known or unknown."

MacFarlane[8] claims that Nelson breached his fiduciary duty in drafting this agreement. The elements of a claim for breach of fiduciary duty are (1) the existence of fiduciary relationship, (2) a breach of duty by the fiduciary, and (3) that the breach resulted in damage to the client or in a benefit to the fiduciary. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999).

---

[6] Rickard signed on three separate lines—as trustee for RSRP investments, as a partner of VBR, and as the vice president of Tuscany. MacFarlane only signed once, as a partner of VBR. The central issue litigated in the prior suit, the Rickard suit, was whether the agreement bound MacFarlane in both his individual and trustee capacities, or just individually. Ultimately, a jury found that the agreement bound MacFarlane both in his individual and trustee capacities, and this Court affirmed the judgment. *See id*. at *6-9.

[7] Further details of their agreement are set forth in our prior opinion. *See id*. at *3-5.

[8] Both MacFarlane and his trust are appellants, and these claims are asserted on behalf of both. In discussing their issues, we will refer to them collectively as "MacFarlane."

6

MacFarlane contends that the first element is satisfied based on his reasonable belief that Nelson was personally representing him and his trust during the meeting and in drafting the settlement agreement. Second, MacFarlane contends that Nelson breached this duty because he had a conflict of interest in simultaneously representing the interests of Rickard and VBR, as well as MacFarlane and his trust, and that this not only required Nelson to inform MacFarlane and Rickard of the conflict, but also to advise them to seek independent counsel and to obtain their written consent prior to participating in the meeting or drafting the agreement. *See* Tex. Disciplinary R. Prof'l Conduct 1.06-.07.[9] Finally, MacFarlane claims that this conflict damaged him because he never intended his trust to be bound by the agreement and, but for Nelson's conflict of interest, Nelson would not have drafted an agreement that bound both MacFarlane and his trust to release Rickard from all potential claims. Thus, MacFarlane claims that Nelson's breach of fiduciary duty caused him and his trust to lose the ability to pursue valuable claims against Rickard for mismanagement.[10]

Nelson responds that the directed verdict was proper because MacFarlane failed to prove the existence of an attorney/client relationship and, hence, there could be no breach. We first address this issue because, if no attorney/client relationship existed between Nelson and MacFarlane

---

[9] The Texas Disciplinary Rules of Professional Conduct are reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G app. A, art. 10, § 9 (West 2005).

[10] Although MacFarlane urges that the record demonstrates ample evidence of the damages he suffered due to Nelson's improper drafting of the settlement agreement, he argues that once he established that a breach occurred, the burden shifted to Nelson to prove that his breach did not damage MacFarlane or benefit Nelson. Nelson counters that the burden remained on MacFarlane to prove he was damaged. We will address the burden-shifting issue in relation to MacFarlane's claim against Nelson regarding the $150,000 transaction.

7

during the April 29 meeting and subsequent drafting of the agreement, it is determinative of the entire issue.

"A relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either: (a) the lawyer manifests to the person consent to do so; or (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services." Restatement (Third) of the Law Governing Lawyers § 14 (2000). If a person reasonably relies on a lawyer to provide legal services, and the lawyer is aware of this reliance but does nothing to prevent it, then an attorney/client relationship may arise by implication. *Id*. § 14 cmt. e. Although an attorney/client relationship can arise by implication, we determine whether there was a "meeting of the minds" using an objective standard, looking at what the parties said and did, and do not consider their unstated, subjective beliefs. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Difficulties in determining the existence of an attorney/client relationship often occur when a lawyer represents a small entity with "extensive common ownership and management," such as a limited partnership. Restatement (Third) of the Law Governing Lawyers § 14 cmt. f. Factors to consider in determining whether an entity lawyer also represents an individual partner include: whether the lawyer affirmatively assumed the duty of individual representation, whether the partner had independent representation, whether the lawyer previously represented the partner on a personal basis, and whether the evidence demonstrates the partner's reliance on or expectations of the lawyer's separate representation. *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994). If the lawyer

8

knows that, contrary to his own intentions, a partner is relying on the lawyer to represent his personal interests as well as those of the partnership, then the lawyer must clarify his intentions. Restatement (Third) of the Law Governing Lawyers § 14 cmt. f. However, an attorney/client relationship is not created with the individual partner simply because the partner discusses matters with the lawyer that are relevant to both the individual's and the partnership's interests. *Id.*

MacFarlane does not claim that Nelson affirmatively manifested an intent to represent MacFarlane and his trust on an individual basis. Instead, MacFarlane's claim that an attorney/client relationship existed between them—or, at least, that it was reasonable for MacFarlane to believe that one did—is based on MacFarlane's claim that Nelson was aware MacFarlane was relying on him for personal representation and failed to manifest a contrary intent.

MacFarlane's own testimony contradicts his claim that it was reasonable for him to believe that Nelson was representing him, individually and as trustee, at the April 29 meeting. MacFarlane testified that, when asked on previous occasions "whether or not Dan Nelson actually represented [him] in the April 29th meeting," he "was not aware of how to answer it properly." MacFarlane's brief states in plain language that, "in drafting the settlement agreement, Nelson was representing VBR and billed VBR for his time" and cites Nelson's testimony of these facts for support. And MacFarlane recognized that, given his involvement with various business transactions in assorted capacities, special care is needed to determine whether an attorney is representing him or one of his entities at any particular time. He testified that, because he has "so many attorneys and they're representing different entities and views at different times," he is "not always clear when

9

someone is representing [him] and when they're not."[11]  With this understanding, it was not reasonable for MacFarlane to assume that Nelson was representing him and his trust in an individual capacity, rather than representing only his partnership, VBR.

MacFarlane further testified that he never affirmatively told Nelson, or any other party, of his personal desire that his trust not be bound by the settlement agreement, that he never read the agreement before signing it, and that, had he read it, he would not have signed it.  This testimony, too, diminishes MacFarlane's claim that his reliance on Nelson's representation was "reasonable."

The record also demonstrates that MacFarlane had consulted independent counsel about his concerns that were the subject of the April 29 meeting and the resulting agreement.  MacFarlane testified that he had met with attorney Eric Taube prior to the April 29 meeting about the problems with VBR and acknowledged that he therefore knew he "had an attorney . . . sitting there that was clearly available to represent [his] interest in that area."  Taube subsequently wrote a letter to MacFarlane explaining the weakness of his case against Nelson.  Taube wrote: "[I]n our initial meeting and on several occasions thereafter, I have asked you whether you felt Dan Nelson represented you in connection with the drafting or negotiation of the Release and Settlement

_____

[11]  MacFarlane claims that, because Nelson had previously represented him, individually and as trustee, in other matters, it was reasonable to assume Nelson was representing him and his trust at the meeting.  The previous representation focused on by MacFarlane was the Steck I transaction.  However, several witnesses, including MacFarlane's expert, testified that Nelson's representation of MacFarlane on that matter had terminated prior to the April 29 meeting.  Other than the Steck I transaction, MacFarlane cites Nelson's involvement with VBR and its related entities (Even Par and Tuscany) as examples of "previous representation."  Because this entire claim turns on whether Nelson's entity representation of VBR also constituted individual representation of MacFarlane and his trust, these examples are not supportive of MacFarlane's claim.

10

Agreement. You admitted from the beginning that he did not." MacFarlane agreed that Taube had asked him several times whether he believed Nelson represented him at the meeting and MacFarlane testified that his responses to Taube were ambiguous. MacFarlane's consultation with independent counsel and the substance of Taube's subsequent letter, which was not contested by MacFarlane, also contradict MacFarlane's claim that it was reasonable for him to believe Nelson represented him and his trust in an individual capacity.

Additionally, Nelson testified that, at the beginning of the April 29 meeting, he explained to MacFarlane and Rickard that, although he and Ramsey had enjoyed representing them and their entities in previous ventures, "I understand that there are some differences between you now . . . [and] we cannot represent you in this conflict. If you want to have a meeting and let us attend and see what can be worked out, I'm happy to do that. But if this is of such a conflict that you need to get independent counsel to represent you, please do so. And both [MacFarlane] and [Rickard] said, . . . 'We want to see if we can get something worked out. Let's go ahead and meet.'" Nelson testified that he "made clear that [he] was not representing anybody other than [VBR]" at the meeting, but he acknowledged that both Rickard and MacFarlane testified that they did not remember this pronouncement. Although Rickard testified that he did not remember Nelson's statement, he testified that he "did not believe that Mr. Dan Nelson was representing Mr. MacFarlane or myself [at the meeting]. . . . The attorneys were there because they knew . . . what was going on in our business and they were there to try to . . . help us come to an agreement and document it for us." Ramsey testified that either she or Nelson stated at the beginning of the meeting that "we can't represent either one of you at this meeting. We're here to facilitate or to observe or to provide

11

information, but that's the extent of what we can do at the meeting today," and that both Rickard and MacFarlane appeared to understand this and, thereafter, conducted their own negotiations. Rickard's testimony also corroborated this; he said "[MacFarlane] and I did most of the talking. Mr. Nelson and Mrs. Ramsey occasionally would kind of keep us on track, so to speak, making sure our conversations were productive."

Only four people were present at the meeting and participated in the drafting of the agreement. Of these people, two testified that MacFarlane was unequivocally advised that Nelson was not representing him or his trust, and the third agreed that the parties understood Nelson was representing only VBR and that the negotiations occurred between MacFarlane and Rickard, without Nelson's intervention. Thus, of the four people, MacFarlane is the only one claiming that it was reasonable for him to believe an attorney/client relationship existed between Nelson and him, individually, for the purposes of the meeting and the subsequent agreement. And MacFarlane's testimony, along with Taube's letter, contradicts this claim. Even MacFarlane's expert, retired Justice C.L. Ray, agreed that the only evidence on the record demonstrated that Nelson represented VBR; that there was no evidence showing Nelson represented Rickard or MacFarlane in their individual capacities; and that the only support for MacFarlane's claim that Nelson represented him individually was MacFarlane's own, uncorroborated statement.

In light of this evidence, reasonable minds could reach only one legal conclusion: at the April 29 meeting and in the subsequent drafting of the settlement agreement, Nelson was not representing MacFarlane or his trust, and it was not reasonable for MacFarlane to believe that he was. Because the evidence conclusively established Nelson's defense—that an attorney/client

12

relationship did not exist and, hence, he could not be liable for a breach of fiduciary duty—it was proper for the trial court to direct the verdict on this issue.[12] *See Prudential Ins. Co. of Am., Inc.*, 29 S.W.3d at 77.

*Steck I Transaction*

In January 1998, Nelson represented MacFarlane and his trust in an attempt to purchase a commercial office building known as Steck I. Problems with the deal arose concerning a "setback provision" and the easement, and MacFarlane had difficulty obtaining the proper financing. As a result, MacFarlane did not purchase the building. Nelson subsequently represented Erwin Becker in purchasing Steck I.[13]

MacFarlane claims that Nelson breached his fiduciary duty because he had a conflict of interest regarding the Steck I transaction, given that he represented two different clients who were both interested in purchasing the same property. He asserts that this constituted a violation of Disciplinary Rule 1.06, which provides that

> (b) . . . [E]xcept to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

---

[12] Ray, MacFarlane's expert, agreed that if no attorney/client relationship existed, then Disciplinary Rules 1.06 and 1.07 were not implicated and, therefore, Nelson would not have breached a fiduciary duty by failing to obtain Rickard's and MacFarlane's written consent or by failing to advise them to consult independent counsel. *See* Tex. Disciplinary R. Prof'l Conduct 1.06-.07.

[13] Nelson testified that the reason Becker was able to purchase Steck I, when MacFarlane had been unable to, was because Becker had "impeccable credit" due to his family's financial backing: "They loaned themselves the money to buy the property. They [unlike MacFarlane] did not have to get a third-party loan."

    (1)  involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

    (2)  reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

(c)  A lawyer may represent a client in the circumstances described in (b) if:

    (1)  the lawyer reasonably believes the representation of each client will not be materially affected; and

    (2)  each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

Tex. Disciplinary R. Prof'l Conduct 1.06.

By MacFarlane's own testimony, Nelson disclosed his intent to assist another client in the purchase of Steck I, and MacFarlane consented to it. MacFarlane testified that "at the same time" he and Nelson decided he would not purchase Steck I, Nelson informed him "that he had another client that was interested in buying it" and asked MacFarlane's permission to represent that client in "look[ing] at this building." MacFarlane testified that he granted Nelson permission to undertake this representation.[14]

Nelson testified that MacFarlane said to him, "I have no continuing interest in buying that building. You go ahead and represent Mr. Becker." At that point, Nelson considered their

---

[14] MacFarlane testified that he gave permission to Nelson with the understanding that the new client would pay him some amount of money to "take over" his contract. The record does not reflect whether MacFarlane received money from this client, but the seller did reimburse MacFarlane for his attorney's fees that he had incurred on the deal.

attorney/client relationship to be "terminated" as to the Steck I transaction; he testified that, prior to representing Becker, "I was completely finished with the earlier representation [of MacFarlane]. That was done and over with." Because the representation of MacFarlane ended before Nelson began his representation of Becker, it was reasonable for Nelson to believe neither client's representation would be materially affected.

Ray, MacFarlane's expert, initially testified that Nelson violated Rule 1.06 by "not informing Mr. MacFarlane that he had another client that was interested in buying this particular building." When confronted with MacFarlane's testimony that he was informed about and consented to Nelson's representation of Becker, Ray testified that it was "very possible" his opinion had been based on an incorrect assumption and that those facts made a "big difference" in his opinion. Ray then agreed that, in light of MacFarlane's testimony, Nelson did not breach any duty regarding the Steck I transaction. Ray also agreed that the attorney/client relationship between Nelson and MacFarlane had terminated for purposes of the Steck I transaction prior to Nelson's representation of Becker.

Even assuming that 1.06(b) was implicated by Nelson's representation of both MacFarlane and Becker regarding the purchase of Steck I, Nelson's conduct was not in violation of Rule 1.06 because he satisfied the exception in subsection (c). *See id*. Any conflict of interest that existed for Nelson in representing both MacFarlane and Becker in the Steck I transaction was remedied by Nelson's reasonable belief that neither client's representation would be materially

15

affected and Nelson's disclosure followed by MacFarlane's consent.[15] Nelson's conduct, therefore, did not violate Rule 1.06. *See id.* Because the evidence conclusively established that Nelson committed no breach of fiduciary duty regarding Steck I, the trial court properly directed the verdict on this claim.[16]

*$150,000 Transaction*

In March 1999, MacFarlane sought to invest $150,000 in a Mississippi hockey team and he approached Nelson about how to obtain the financing. After some initial options fell through, MacFarlane suggested that Rickard and Nelson provide him with the financial backing for the investment. Rickard and Nelson agreed to pay MacFarlane $150,000 in exchange for the right to collect the next $175,000 in payments from a $2.375 million note held by MacFarlane.[17] On March 10, 1999, the parties signed a "partial mortgage purchase agreement" stating that "Owner [MacFarlane] hereby sells to Buyer [Rickard, as trustee for RSRP investments, and Nelson] the next [$175,000.00] in payments to be made on the Note. . . . Owner sells said payments to Buyer for the sum of [$150,000.00]." This transaction was secured by MacFarlane assigning to Rickard and Nelson his interest in two VBR condominium units. Several months later, a $15,000 distribution was made from the note, resulting in payments of $7,500 each to Rickard and Nelson. Although

---

[15] Although the rule mandates that "each" client consent after full disclosure, here we are concerned only with MacFarlane's informed consent.

[16] As with MacFarlane's claim regarding the April 29 meeting, he urges that, once he established a breach, the burden shifted to Nelson to prove a lack of damages. However, because the record evidences no breach, it is not necessary to address the damages issue.

[17] Each of them put forth $75,000 with the expectation of earning $87,500.

16

Rickard and Nelson were still owed $80,000 each, no further payments were made. As a result of MacFarlane's default, on November 6, 2001, Rickard and Nelson foreclosed on condominium unit 190 for $160,000.

MacFarlane claims that Nelson breached his fiduciary duty because, as his attorney, Nelson should not have entered into a business transaction with MacFarlane without obtaining his written consent or advising him to consult independent counsel, as is required by Disciplinary Rule 1.08:

> (a) A lawyer shall not enter into a business transaction with a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client;
>>
>> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>>
>> (3) the client consents in writing thereto.

Tex. Disciplinary R. Prof'l Conduct 1.08.

We review all business dealings between a lawyer and a client using the strict scrutiny standard. *State v. Dolenz*, 3 S.W.3d 260, 266 (Tex. App.—Dallas 1999, no pet.) (analyzing Rule 1.08 violation). "[W]hen a client attacks the validity of a transaction with a lawyer, the lawyer has the burden of justifying the transaction." *Id*. at 267. Nelson urges that the directed verdict on this claim was proper because the terms of the transaction were "fair and reasonable" to MacFarlane.[18]

---

[18] Nelson also urges that there was no breach because an attorney/client relationship did not exist between him and MacFarlane at the time of the foreclosure in 2001. This defense is without

17

Even assuming the terms were fair, however, this would not conclusively establish Nelson's defense because Rule 1.08 requires that all three conditions be satisfied in order for a lawyer to properly enter a business deal with a client. Thus, we must consider whether Nelson advised MacFarlane to seek independent counsel and whether he obtained MacFarlane's written consent.

Nelson testified that he did not inform MacFarlane of a conflict of interest, did not advise MacFarlane to seek independent counsel, and did not get MacFarlane's written consent. Nelson testified that he did not consider any of these steps necessary because "I thought I was a friend of him and I didn't do it. Shame on me." When asked, "So you just disregarded the last requirement of the rule?," Nelson responded, "I did."

Based on Nelson's testimony, a reasonable mind could conclude that Nelson violated Rule 1.08(a). *See Bostrom Seating, Inc.*, 140 S.W.3d at 684 (standard of proof required for directed verdict).[19] To overcome a directed verdict on his claim for breach of fiduciary duty, however, MacFarlane also had to establish that this breach resulted in damage to himself or in a benefit to Nelson. *See Burrow*, 997 S.W.2d at 237. As with his other claims, MacFarlane urges that, once the breach was established, the burden shifted to Nelson to disprove that MacFarlane was damaged or that Nelson benefitted.

---

merit because the relevant time period was when Nelson entered this deal with MacFarlane, which was in March 1999.

[19] *See also* Restatement (Third) of the Law Governing Lawyers § 126 cmt. d, illus. 3 (2000) (lawyer violates Rule 1.08 when loans client money to finance purchase of boat, via agreement secured by client's other property, without explaining terms to client, and then client defaults, and lawyer forecloses on property).

MacFarlane cites *Keck v. National Union Fire Insurance Co.* as support for his argument that the burden shifted to Nelson, but *Keck* does not place the burden of disproving damages on an attorney. 20 S.W.3d 692, 699 (Tex. 2000). *Keck* holds only that, in order to establish its defense, the law firm carried the burden to establish that the agreement was "fair and reasonable" and that the client was informed of its terms. *Id.* Cases analyzing whether a verdict should be directed in favor of an attorney on a client's claim for breach of fiduciary duty hold that the client carries the burden to establish that the attorney's breach caused him damage; where the client offers no probative evidence of damages, the directed verdict is proper. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 191 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

MacFarlane claims he suffered damages because, in exchange for the $150,000 paid to him by Rickard and Nelson, he lost title to condominium unit 190, which was valued between $575,000 and $850,000. During cross-examination, however, MacFarlane agreed that, "if [he] had simply paid the money that [he] owed Mr. Nelson [and] Mr. Rickard, [his] condo wouldn't have been foreclosed on by them" and that it is "[his] responsibility for not paying that debt." Based on this, MacFarlane did not carry his burden on damages; the only conclusion that reasonable minds could reach from this evidence is that any damage MacFarlane suffered was the result of his own default, not Nelson's breach. *See Jones*, 638 S.W.2d at 865.

19

*Conclusion of Issue 1*

Because the trial court properly directed the verdict in Nelson's favor on MacFarlane's breach of fiduciary claims regarding the April 29 meeting and settlement agreement, the Steck I transaction, and the $150,000 transaction, MacFarlane's first issue is overruled.

## Issue 2: Claims against Bishop/Clark Thomas

*Handling of the Rickard Suit*

Two months after signing the settlement agreement that resulted from the April 29 meeting, Rickard sent MacFarlane documents showing that their partnership, VBR, was insolvent. MacFarlane felt this information was inconsistent with the VBR financial data that Rickard had presented at the meeting. MacFarlane, therefore, refused to honor the terms of the settlement and release, and Rickard sued him in June 2000 to enforce the agreement.

MacFarlane hired Bishop/Clark Thomas to represent him in the Rickard suit.[20] In an attempt to rescind the agreement on MacFarlane's behalf, Bishop/Clark Thomas asserted several affirmative defenses and counterclaimed that Rickard was liable for breach of contract, breach of fiduciary duty, and gross negligence based on his mismanagement of the partnership. Ultimately, a jury found that the settlement agreement and release were fair to and binding on MacFarlane, in both his individual and trustee capacities, and the trial court entered a final, take-nothing judgment in Rickard's favor. Following unsuccessful motions for new trial and judgment notwithstanding the verdict filed by Bishop/Clark Thomas, MacFarlane hired Gary DeShazo to appeal the judgment to

---

[20] MacFarlane was initially represented by Eric Taube. But after Taube wrote MacFarlane concerning the weaknesses he saw in MacFarlane's claims, MacFarlane hired Bishop/Clark Thomas.

20

this Court. Holding that the appeal was perfected only on behalf of MacFarlane individually, and not as trustee, this Court dismissed the portion of his appeal seeking relief on behalf of the trust, overruled his other claims, and affirmed the judgment. *See MacFarlane v. Rickard*, No. 03-01-00507-CV, 2002 Tex. App. LEXIS 5421, at *26 (Tex. App.—Austin July 26, 2002, no pet.) (mem. op.).

MacFarlane now claims that Bishop/Clark Thomas negligently handled the Rickard suit, that their negligence injured him, and that damages occurred because it resulted in a judgment that bound him and his trust to the terms of the settlement agreement and release and, therefore, denied him and his trust the ability to pursue claims against Rickard for mismanagement of the partnership. Specifically, MacFarlane asserts that Bishop/Clark Thomas committed legal malpractice in the Rickard suit through the following acts of negligence: failing to obtain a continuance on MacFarlane's behalf; failing to timely file a plea in abatement to join the partnership, VBR, as an indispensable party; failing to plead a lack of consideration as a basis to rescind the agreement; and failing to prevent the admission of parole evidence of the parties' intent in entering the settlement agreement.

To recover on a claim for legal malpractice, the plaintiff must establish that the attorney owed the plaintiff a duty, the attorney breached that duty, the breach proximately caused the plaintiff's injuries, and damages occurred. *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989). A plaintiff can establish a breach with evidence that the attorney failed to exercise the appropriate standard of care, that of a reasonably prudent attorney. *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525, 530 (Tex. App.—Austin 2005, no pet.) (imperfect actions by attorney do not constitute

21

negligence if reasonably prudent attorney could make same decision, considering objective standard of professional judgment).

When a legal malpractice claim arises from prior litigation, the plaintiff's burden to prove proximate cause is known as the "suit-within-a-suit" requirement; that is, the plaintiff must prove that, but for the attorney's negligence, the plaintiff would be entitled to judgment, and to show what amount he would have recovered in the judgment. *Hall v. Rutherford*, 911 S.W.2d 422, 424 (Tex. App.—San Antonio 1995, writ denied). Although the issue of whether the attorney's negligence proximately caused damage to the plaintiff is usually a question of fact, the element of causation may be determined as a matter of law if the circumstances are such that reasonable minds could not arrive at a different conclusion. *Wilkerson*, 150 S.W.3d at 533.

In addition to asserting that MacFarlane lacked evidence on essential elements of each legal malpractice claim, Bishop/Clark Thomas urge that the judgment should be affirmed regarding all of these claims because MacFarlane failed to prove the suit-within-a-suit requirement—*i.e.*, MacFarlane failed to prove that, but for Bishop/Clark Thomas's negligence, MacFarlane would have prevailed and collected damages against Rickard for mismanagement of the partnership. We begin by addressing this issue because, if the evidence presented at trial was such that reasonable minds could not have determined that Bishop/Clark Thomas proximately caused damage to MacFarlane, individually or as trustee, then the directed verdict was proper on each of MacFarlane's legal malpractice claims.

The record reflects several problems with MacFarlane's underlying suit against Rickard. First, MacFarlane failed to establish that Rickard was the party who should be held

22

responsible for any mismanagement of VBR. MacFarlane acknowledged that Tuscany, not Rickard, was the managing partner of VBR. Ray testified that, if a valid mismanagement claim existed, it should have been brought against Tuscany, as the managing partner. Ray also testified that he had no opinion on the validity of MacFarlane's claim that Rickard mismanaged VBR's construction of the East Side condominiums. *See FFE Transp. Serv., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004) (expert testimony needed on topics not within common experience of layman); *Ruebeck v. Hunt*, 176 S.W.2d 738, 740 (Tex. 1943) (building construction topics are beyond layman's understanding); *see also Alexander v. Turtur & Assoc.*, 146 S.W.3d 113, 119-20 (Tex. 2004) (in absence of expert testimony, plaintiff failed to prove suit-within-a-suit and, therefore, was not entitled to judgment against attorney for legal malpractice).

MacFarlane acknowledged that the ownership of Tuscany was equally divided between himself and Rickard and he testified that he and Rickard were "complete 50/50 partner[s]" of VBR, that the partnership arrangement was "fair," and that there was nothing in the partnership documents "that gave Mr. Rickard an edge over [MacFarlane] in terms of power or . . . a right to manage the property." Nevertheless, MacFarlane denied that he should share equal responsibility with Rickard for any mismanagement of VBR and instead urged that Rickard should take full responsibility because Rickard "bullied" him and "had a lot of power over" him. MacFarlane claimed that, because of his stroke, he was unable to do anything to prevent the mismanagement besides complaining to Rickard, Nelson, and Ramsey. MacFarlane acknowledged, however, that his signature was required on many of VBR's checks and that he signed the checks without looking

23

at the amounts or payees, which he admits was "probably not" a good business practice. MacFarlane did not challenge Rickard's testimony that he never forced or pressured MacFarlane to sign a check.

Although MacFarlane had asserted an alter ego claim against Rickard in the underlying suit, he offered no evidence to hold Rickard responsible for any mismanagement of VBR. MacFarlane also failed to adduce proof that Rickard had committed fraud, self-dealing, or gross negligence. MacFarlane agreed that he had previously testified to having "no evidence that [Rickard] intended to deceive [him]" and MacFarlane testified that "I don't believe to this day that [Rickard] cheated me on any finances."

Even had MacFarlane put forth sufficient evidence to show that he would have prevailed on a claim against Rickard for mismanagement, his suit-within-a-suit requirement would not be satisfied in the absence of probative evidence on damages. *See Hall*, 911 S.W.2d at 424 (plaintiff must show that he would have prevailed and amount of damages he would have recovered).

The trial judge stated that he was "especially persuaded" to direct the verdict based on MacFarlane's lack of evidence on damages. When MacFarlane's expert was asked whether, in his opinion, Bishop/Clark Thomas's negligence proximately caused damage to MacFarlane, Ray offered only the conclusory response, "yes,"[21] without any explanation as to how such negligence resulted in harm to MacFarlane or what the amount of damages was. When he was questioned about specific damages and whether the amount MacFarlane "could have gotten out of some lawsuit" was "pure speculation," Ray responded that it was, and that was why he could not provide an opinion on

---

[21] Ray's conclusory, affirmative response is the only testimony cited by MacFarlane as support for his assertion that proof of "damages was established by MacFarlane's testimony, as well as the testimony of expert witness C.L. Ray."

24

the issue. *See Schlager v. Clements*, 939 S.W.2d 183, 188-89 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (in legal malpractice case, evidence of damages was insufficient where plaintiff's expert admitted any estimate on damages was "speculative" and refused to specify an amount).

In his brief, MacFarlane asserts that "the record is sufficient to support a finding that the value of those mismanagement claims was either MacFarlane's share of the East Side development rights (1/2 of $4.5 Million), or the sum of the unpaid portion of his land note plus his share of the $3.5 Million in projected profits" and that his trust lost "its share of VBR's projected profits." Yet, MacFarlane does not provide a single record cite to support these assertions. Further, our review of the record does not reveal any support for these claims beyond MacFarlane's own, conclusory statements. MacFarlane characterized these projected sums as "expectations," rather than as amounts to which he was entitled or likely to recover had the partnership not turned sour. *See Szczepanik*, 883 S.W.2d at 650 (speculative evidence that plaintiff "expected to make a profit . . . is legally insufficient to show lost profits").

MacFarlane also failed to establish the amount of his alleged damages with any specificity. *See Hall*, 911 S.W.2d at 424. The extent of damages must be shown with a reasonable degree of certainty: "There can be no recovery for damages which are speculative or conjectural. The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). Although MacFarlane stated the above amounts, he did not provide any calculation or expert testimony for how those amounts were determined, and no other

25

witness's testimony corroborated the amounts. *See Alexander*, 146 S.W.3d at 115 (to prevail in legal malpractice case, plaintiff needed expert testimony "connect[ing] the client's damages to the attorney's negligence"); *Szczepanik*, 883 S.W.2d at 649 ("At a minimum, opinions or estimates on lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. Recovery of lost profits must be predicated on one complete calculation."). MacFarlane acknowledged that he was unable to provide a specific amount of damages, stating in his brief that the "existence of damages has been proven, and the amount of damages is a jury issue." This is contrary to established precedent holding that, to satisfy the suit-within-a-suit requirement, a plaintiff must provide probative evidence showing not only that he would have prevailed, but also the amount of damages incurred. *Crosgrove*, 774 S.W.2d at 666; *Wilkerson*, 150 S.W.3d at 533; *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *Hall*, 911 S.W.2d at 424.

Even if Bishop/Clark Thomas committed negligence in the Rickard suit by failing to obtain a continuance, failing to timely file a plea in abatement, failing to plead a lack of consideration, and failing to prevent the admission of parole evidence, MacFarlane did not establish that such negligence proximately caused harm to him or his trust because he put forth no evidence of probative force to show either that he could have prevailed on his suit within a suit—his mismanagement claims against Rickard—or that he could have collected some reasonably certain amount of damages from Rickard in that suit. It was, therefore, proper for the trial court to direct the verdict in favor of Bishop/Clark Thomas on MacFarlane's claims against them for legal malpractice. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77.

*Renegotiation of Fees*

In his final complaint on appeal, MacFarlane urges that Bishop/Clark Thomas committed a breach of fiduciary duty by renegotiating their fee arrangement on the eve of trial, without advising MacFarlane to seek the advice of independent counsel. Before considering the merits of this issue, however, we must address MacFarlane's claim that the verdict was not directed on this matter because Bishop/Clark Thomas's motion was confined to the legal malpractice claims and failed to mention this breach of fiduciary duty claim.

A party moving for a directed verdict shall "state the specific grounds therefor." Tex. R. Civ. P. 268. Even still, the failure to specify a ground in the motion is not fatal if there are no fact issues raised by the evidence and the prevailing party is entitled to judgment as a matter of law and, even if the reason given by the trial court is erroneous, the granting of a directed verdict can be affirmed if another ground exists to support it. *Texas Employers Ins. Ass'n v. Page*, 553 S.W.2d 98, 102 (Tex. 1977); *Deutsch*, 97 S.W.3d at 195.

When the attorney for Bishop/Clark Thomas orally moved for a directed verdict, he specifically addressed the lack of evidence on each of MacFarlane's negligence claims, as well as MacFarlane's overriding lack of evidence on the suit-within-a-suit requirement and damages. He concluded by saying, "for those reasons, Your Honor, I would request that the Court direct the verdict on the legal malpractice claims against Clark Thomas and Barry Bishop." The attorney for Bishop/Clark Thomas did not specifically address the breach of fiduciary duty claim in his oral presentation. The attorney did, however, begin his oral motion by saying, "Your Honor, at this time, defendants Clark Thomas and Barry Bishop would move for judgment. We actually have a written

27

document." Bishop/Clark Thomas's written motion for directed verdict appears in the record and addresses the breach of fiduciary duty claim.

Following the defendant's motions and MacFarlane's rebuttal, the court announced that it was "going to grant the motion for directed verdict." Bishop/Clark Thomas's attorney immediately asked the court to clarify whether the ruling included the fiduciary duty claim, and the court responded, "I am granting the motions as they were presented in full. . . . I am convinced and I find that there's no evidence to support a verdict in this case on damages, but I am granting the entire motions." At that point both Nelson's and Bishop/Clark Thomas's attorneys "note[d] for the record" that they had moved for directed verdict on "all claims," and the court affirmed that "[t]he damages argument took care of all claims." The trial court's final judgment confirms that the breach of fiduciary duty claim was included in the directed verdict, stating that "judgment should be rendered in favor of CTW/Bishop and Nelson as a matter of law with regard to all claims asserted against them in this cause." The record, therefore, sufficiently demonstrates that the trial court considered and ruled on MacFarlane's breach of fiduciary duty claim against Bishop/Clark Thomas when it granted the directed verdict on "all claims" against the defendants.

The question becomes, then, whether it was proper to direct the verdict on MacFarlane's claim that Bishop/Clark Thomas breached their fiduciary duty by engaging in an improper fee renegotiation. To prevail on a claim for breach of fiduciary duty, the plaintiff must establish (1) the existence of fiduciary relationship, (2) a breach of duty by the fiduciary, and (3) that the breach resulted in damage to the client or in a benefit to the fiduciary. *Burrow*, 997 S.W.2d at 237.

MacFarlane testified that, approximately one week "[b]efore trial, [Bishop/Clark Thomas] told me they needed some sort of collateral or grantee [sic] that I could pay the fees" and that, as a result, he "put up the note . . . the balance of the $1.975 million note as collateral." MacFarlane also testified that the collateral he provided in response was a lien on the two VBR condominium units he had received in the settlement with Rickard, units 190 and 191. He could not recall the value of the lien, testifying that, "I believe it's 400,000 or 103,000. I'm not exactly sure." Regardless of whether the collateral was the balance on his note or a lien against his condominiums, MacFarlane claims the transaction constituted a renegotiation of his attorney's fees arrangement and that, by not advising him to seek independent counsel, Bishop/Clark Thomas breached their fiduciary duty. *See Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1964) (presumption of unfairness attaches to contracts negotiated for attorney's compensation after attorney/client relationship has begun).

Bishop/Clark Thomas characterized these events differently. Bishop testified that MacFarlane had been very concerned about his ability to pay his attorney's fees and thus, "[a]t a point well after the trial, Mr. MacFarlane came in and discussed giving us a deed of trust to secure the payment of those fees. . . . And he gave us a deed of trust on . . . one of both of those units, 190 and 191." Bishop admitted that he did not advise MacFarlane to seek independent counsel, but claims that was not necessary because this transaction was not a fee renegotiation and because it was "fair and equitable" to MacFarlane.

The deed of trust shows that, on April 25, 2001, MacFarlane granted a lien to Bishop/Clark Thomas on units 190 and 191 "[t]o secure payment of all accounts and indebtedness, whether existing or hereinafter incurred, owed by Grantor to Beneficiary." This document

29

corroborates Bishop's testimony that the transaction occurred after the Rickard suit, which took place at the end of February and beginning of April 2001. The record, however, also contains copies of billing statements sent by Bishop/Clark Thomas to MacFarlane through August 2001, evidencing that their attorney/client relationship was ongoing at the time of the April 25 transaction.

As previously discussed, Disciplinary Rule 1.08 prohibits an attorney from entering a business transaction with a current client unless (1) the terms are fair, reasonable, and fully disclosed to the client, (2) the client has a reasonable opportunity to consult independent counsel, and (3) the client provides written consent to the transaction. Tex. Disciplinary R. Prof'l Conduct 1.08. Even assuming MacFarlane established that Bishop/Clark Thomas violated this rule, however, to prevail on his breach of fiduciary duty claim MacFarlane was still required to put forth probative evidence that this breach resulted in damages to himself or in a benefit to Bishop/Clark Thomas. *See Burrow*, 997 S.W.2d at 237; *Deutsch*, 97 S.W.3d at 191.

The only damage MacFarlane claims to have suffered from this transaction is that his indebtedness to Bishop/Clark Thomas went from being "uncollateralized" to being secured by a lien on condominium units 190 and 191. But MacFarlane offered no expert testimony to show how this arrangement was harmful to him, and there is no evidence that MacFarlane had actually suffered any economic loss as a result. Based on this, MacFarlane did not carry his burden on damages; the only conclusion that reasonable minds could reach from this evidence is that, even if Bishop/Clark Thomas violated Rule 1.08, it was not damaging to MacFarlane. *See Jones*, 638 S.W.2d at 865. The trial court recognized this by granting a directed verdict on all claims.

30

*Conclusion of Issue 2*

Because the trial court properly granted a directed verdict in Bishop/Clark Thomas's favor on MacFarlane's claims against them for legal malpractice—based on MacFarlane's failure to prove his suit-within-a-suit—and on the breach of fiduciary claim—based on MacFarlane's lack of damages evidence—MacFarlane's second issue is overruled.

**CONCLUSION**

Having determined that the trial court properly granted directed verdicts in favor of defendants Nelson and Bishop/Clark Thomas on each of MacFarlane's claims against them, we overrule MacFarlane's issues, and affirm the judgment in all respects.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   September 15, 2005