The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**, Petitioner,

v.

**FINANCIAL REVIEW SERVICES, INC.**, Respondent.

No. 98–1053.

Supreme Court of Texas.

Argued Oct. 6, 1999.

Decided June 29, 2000.

Rehearing Overruled Nov. 9, 2000.

James McConn, Jr., Craig S. Wolcott, Susan C. Stevenson, Hays McConn Rice & Pickering, Houston, for Petitioner.

Norman Riedmueller, Houston, for Respondent.

Justice GONZALES delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ABBOTT, Justice HANKINSON, and Justice O'NEILL joined.

The principal issue we consider is whether the defendant, The Prudential Insurance Company of America, conclusively established its justification defense in this tortious interference case. The trial court granted Prudential a partial summary judgment on some issues and directed a verdict on the remaining issues after the plaintiff rested its case. The court of appeals reversed the judgment and remanded to the trial court, holding that fact issues remained for the factfinder to resolve. —— S.W.3d ——. We conclude that Prudential did not conclusively establish that its interference with the plaintiff's contracts and future business relations was justified. Accordingly, we affirm the judgment of the court of appeals.

## Background

Financial Review Services, Inc. (FRS) audits hospital bills, looking for uncharged services and supplies omitted from patients' hospital bills. FRS provides its services to hospitals for an equal share of the otherwise-lost charges it collects. Two of FRS's early audit contracts were with hospitals affiliated with Hospital Corporation of America (HCA), one of the major healthcare corporations in the United States. In June 1991, FRS obtained contracts with two HCA hospitals in Houston, HCA Women's Hospital of Texas and HCA Medical Center Hospital. These two Houston hospitals together are known as the HCA Center for Health Excellence (CHE). Each CHE hospital gave FRS a six-month contract to discover and collect their unbilled medical services, and the parties renewed both contracts for another six months at the end of the initial terms. Meanwhile, FRS began negotiating a similar contract with an HCA hospital in another city, HCA Rio Grande.

After it audited CHE, FRS sent out an initial group of about 2000 bills for previously unbilled services. Approximately 100 of the bills went to Prudential for hospital services rendered to its policyholders. Prudential responded with a letter to John Gilbert, CHE's chief financial officer, stating that Prudential would not consider the claims unless CHE first billed the patients and provided their complete medical records to Prudential for review. CHE complied with this request. Prudential then conducted its own audit and denied all the claims as unsupported by CHE records. Meanwhile, Prudential sent letters to its policyholders about the status of these claims. A significant number of Prudential policyholders, other patients, doctors, and the Better Business Bureau complained to CHE about the back-billing. Eventually, CHE terminated its contracts with FRS. Also, FRS lost the contract it had obtained with HCA Rio Grande.

FRS sued Prudential, claiming that it tortiously interfered with FRS's "business and contractual relationships with HCA and its hospitals," in particular, FRS's existing contracts with CHE and HCA Rio Grande, and that Prudential breached an oral agreement with FRS to abide by the results of Prudential's audit of FRS's bills. FRS contended that Prudential tortiously interfered in five ways: (1) Prudential refused to pay FRS's bills and other bills

from HCA hospitals, (2) Prudential "maligned" FRS to CHE and the patients, (3) Prudential harassed HCA officials with "sham" audits, pressure tactics, and unreasonable, bad faith demands, (4) Prudential stirred up the insureds to make patient complaints to CHE, and (5) Prudential started false rumors about FRS, intending that they reach HCA management.

Prudential moved for summary judgment on all claims. The trial court granted a partial summary judgment resolving some of the tortious interference issues against FRS. The court decided that FRS had no cause of action for Prudential's handling of bills audited by FRS, because Prudential owed FRS no duty to pay CHE's bills in the first place. The court also determined Prudential had an absolute right to object to, question, and investigate the bills, and had the right to complain about the practice of late billing in general and FRS's procedures in particular. Finally, the court decided that Prudential had an absolute right to communicate with its insureds about the billing. However, it denied summary judgment on FRS's complaints about Prudential's communications to the insureds and CHE because, the trial court concluded, the communications could be tortious depending on their content.

At trial on these remaining issues, FRS presented its case for breach of contract and tortious interference and then rested. Prudential orally moved for directed verdict on all issues. Prudential argued that the trial court's partial summary judgment reduced the issues to whether Prudential breached a contract with FRS and whether Prudential's communications concerning FRS tortiously interfered with FRS's auditing contracts. Prudential urged that it was entitled to judgment because (1) there was no evidence of a contract and (2) all of Prudential's communications and conduct were justified and did not cause FRS to lose its contracts. The court granted the motion, rendering a final take-nothing judgment on all of FRS's claims.

On appeal, FRS challenged both the partial summary judgment and the directed verdict. The court of appeals affirmed the partial summary judgment and the breach of contract portion of the directed verdict. —— S.W.3d ——. But the court of appeals reversed and remanded the remainder of the directed verdict. The court held that there were fact questions about whether some of Prudential's conduct and communications tortiously interfered with FRS's contracts and business relationships. —— S.W.3d ——. Prudential has petitioned this Court for review.

## Standard of Review

A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). A directed verdict for a defendant may be proper in two situations. First, a court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *See Latham v. Castillo*, 972 S.W.2d 66, 67–68, 70–71 (Tex.1998). Second, as other courts have held, a trial court may direct a verdict for the defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See, e.g., Villegas v. Griffin Indus.*, 975 S.W.2d 745, 748–49 (Tex.App.— Corpus Christi 1998, pet. denied); *Davis v. Mathis*, 846 S.W.2d 84, 86 (Tex.App.— Dallas 1992, no writ); *see generally* Elliot, *Jury Trial: General, in* 4 McDONALD TEXAS CIVIL PRACTICE § 21:52 (Allen et al. eds., 1992 ed.).

 We have identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Also, as an affirmative defense, a

defendant may negate liability on the ground that its conduct was privileged or justified. *See id.* at 431. Under a directed verdict standard, then, a judgment for Prudential could be proper if (1) FRS failed to present evidence about one of the elements of the tort, (2) Prudential conclusively negated one of those elements, or (3) Prudential conclusively established its justification defense.

In addition to FRS's claim of tortious interference with its existing contracts with CHE and HCA Rio Grande, FRS's pleadings claimed Prudential's conduct caused FRS to lose its "business and contractual relationship with HCA and its hospitals." After the CHE contracts were terminated, FRS had no existing contracts with HCA. Therefore, FRS's pleadings seem to seek damages for the lost opportunity to obtain contracts in the future with other HCA affiliated hospitals. In other words, FRS appears to be asserting a claim for tortious interference with prospective contracts with other HCA affiliated hospitals. We have never enumerated the elements of a cause of action for tortious interference with prospective contracts, although we have concluded that justification is an affirmative defense to tortious interference with prospective business relations as well as to tortious interference with an existing contract. *See Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). Neither the courts below nor the parties in their briefing here have distinguished between the two torts. But we may address Prudential's specific arguments without deciding what all of the elements of proof for tortious interference with prospective business relations might be.

Prudential contends that the trial court correctly directed a verdict because FRS's status as CHE's and HCA Rio Grande's agent precludes FRS's tortious interference claim, and nothing Prudential did caused FRS to lose its contracts and relationships. Additionally, Prudential claims that the evidence conclusively established

its justification defense. We consider first Prudential's agency arguments.

## Tortious Interference with an Agent's Contract

■ Prudential argues that because FRS is CHE's and HCA Rio Grande's agent for collecting payment, FRS cannot bring a claim for tortious interference with contract. Prudential's arguments are based on the proposition that, for many purposes, an agent and principal are treated as one, and one cannot interfere with one's own contract. From these premises, Prudential contends that an agent cannot sue a third party for the commissions the agent would have received on a contract between the third party and the agent's principal. We understand Prudential's arguments as pertaining only to FRS's claim of tortious interference with existing contracts with CHE and HCA Rio Grande, because only those entities had a principal-agent relationship with FRS.

To properly consider Prudential's arguments it is important to identify the contractual relationships between Prudential, CHE, HCA Rio Grande, and FRS. CHE and HCA Rio Grande have a contractual relationship with Prudential, because Prudential's insureds assigned their policy rights to those hospitals when they were patients. But FRS brought suit for claimed interference with its auditing contracts with CHE and HCA Rio Grande, not the contracts between Prudential and the hospitals.

Prudential argues that the contracts are inseparable, because CHE employed FRS to assist it in CHE's relations with Prudential and others like it. Prudential claims that FRS's suit is, in essence, a suit for the commissions FRS would have received if Prudential had paid its bills to the hospitals. Thus, Prudential contends that the identity of interests of the hospitals and their agent, FRS, prevents FRS from suing for tortious interference. Prudential bases this argument on three cases, *Holloway v. Skinner,* 898 S.W.2d 793 (Tex.1995),

*Morgan Stanley & Co. v. Texas Oil Co.,* 958 S.W.2d 178 (Tex.1997), and *LA & N Interests, Inc. v. Fish,* 864 S.W.2d 745 (Tex.App.—Houston [14th Dist.] 1993, no writ), *disapproved on other grounds by, Trammell Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631 (Tex.1997). Prudential asks us to draw a broad principle from these cases—that an agent cannot sue a third party for lost commissions on a contract between the third party and the agent's principal.

In *Holloway,* the holder of a corporation's promissory note sued the director of a corporation for tortiously interfering by inducing the corporation to default on the note. 898 S.W.2d at 794. We noted that a suit against a corporation's agent posed special problems for the second element of a tortious interference claim, that a non-party to the contract interfered with the contract. *See id.* at 796. We recognized the fundamental principle that a party to a contract cannot tortiously interfere with its own contract. *See id.* at 795. Yet a corporation can only act through its agents, so that it is necessary to differentiate between the acts of an agent on behalf of the principal from those done in the agent's self-interest. *See id.* at 795–96. Consequently, we held that to hold an agent liable under such circumstances, the plaintiff had to show that the agent acted so contrary to the principal's best interests that his actions could only have been motivated by personal interests. *See id.* at 796.

In *Morgan Stanley,* we applied the *Holloway* rule to a claim for tortious interference with a prospective business relation, emphasizing that the plaintiff cannot recover without proof that the agent acted in its own interest at the expense of the principal. *Morgan Stanley,* 958 S.W.2d 178, 179 (Tex.1997). We also held that if a corporation does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests. *See id.* at 182; *see also*

*Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 457 (Tex.1998).

Prudential argues that *Morgan Stanley* stands for the proposition that if the principal does not complain about another party's conduct on a matter of interest to the principal, then neither can the agent. While we noted in *Holloway* and *Morgan Stanley* that the interests of an agent and a principal are often the same, those cases do not otherwise apply. In those cases the agent was the defendant, and the issue was how to differentiate whether the defendant was acting in the company's interest or in the agent's self-interest when the agent allegedly interfered with a third party's contract. In *Holloway* and *Morgan Stanley,* we held, "for reasons of logic and law," that a third party generally has no cause of action against an agent for inducing the principal to breach a contract with a third party. *Morgan Stanley,* 958 S.W.2d at 179; *Holloway,* 898 S.W.2d at 796. We held in both cases that to recover for tortious interference in such a situation, a plaintiff must prove that the agent willfully or intentionally acted to advance the agent's own interests at the principal's expense. *See Morgan Stanley,* 958 S.W.2d at 179; *Holloway,* 898 S.W.2d at 798.

But here, FRS, the agent, is the plaintiff complaining that Prudential interfered with its auditing contracts with CHE and HCA Rio Grande. Prudential is neither a party to, nor an agent of the hospitals under those contracts. Because the concerns in *Holloway* and *Morgan Stanley* are not implicated here, neither case supports the absolute rule that Prudential urges.

Prudential also argues that, because FRS was paid on commission, its interests are essentially the same as the hospitals', and because the hospitals may not sue Prudential in tort for not paying the bills, neither can FRS. Prudential bases this argument on *LA & N Interests, Inc. v. Fish,* 864 S.W.2d 745, 749 (Tex.App.—Houston [14th Dist.] 1993, no writ), in which the court of appeals held that a real-

estate agent had no tortious interference claim against a prospective purchaser based on the purchaser's breach of contract that denied the agent's commission. *See LA & N Interests, Inc.,* 864 S.W.2d at 749. But *LA & N* does not apply because there the only claimed injury was the commission the agent would have realized from the sale to the third party. Here, FRS is not merely seeking its lost commissions on Prudential's bills, FRS also alleges that Prudential interfered with its contract to audit bills of all CHE and HCA Rio Grande patients. The majority of patient accounts that FRS audited for CHE did not concern Prudential policyholders. Of the initial 2,000 bills that FRS sent out for CHE, fewer than 100 were to Prudential policyholders. FRS eventually sent out 9,000 bills. HCA Rio Grande terminated its contract before FRS sent out any bills, so we do not know if any bills would have been sent to Prudential policyholders. The fact that FRS was CHE's and HCA Rio Grande's agent, paid on commission, does not establish the identity of interest between FRS and those hospitals that was important in *LA & N.*

Accordingly, we conclude that FRS's agency status is not a barrier to a tortious interference claim involving FRS's auditing contracts with CHE and HCA Rio Grande. We turn next to Prudential's arguments that it conclusively established its justification defense and that it did nothing to cause FRS to lose its contracts.

### Justification Defense

■ Prudential claims that it established its justification defense as a matter of law. Justification is an affirmative defense to tortious interference with contract and tortious interference with prospective business relations. *See Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). As we explained in *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996), the justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable

legal right, even though that claim ultimately proves to be mistaken. We stated that if a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant. *See id.* Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith. *See id.*

The trial court here granted summary judgment against FRS on all of its tortious interference claims except those based on Prudential's communications to its own policyholders and to CHE. The court of appeals affirmed the summary judgment, characterizing Prudential's privilege to communicate to its policyholders and CHE as a "qualified" privilege. —— S.W.3d ——. The court of appeals's opinion implied that an insurance company's communications to its policyholders, other than those conveying truthful information, can never be privileged as a matter of law, and necessarily present a fact question about good faith. —— S.W.3d ——. The opinion also held that Prudential's communications with the hospitals were privileged only if it had a good faith belief in a colorable right, a fact question for the jury. —— S.W.3d ——.

■ There well may be a fact question about what Prudential said to CHE or the policyholders. But, as *Texas Beef* explains, whether the communication was privileged or justified, or merely the exercise of a colorable right, is a question of law for the court. *See Texas Beef,* 921 S.W.2d at 211. The issue of the defendant's good faith is pertinent only if the court determines the defendant had a colorable right, but not a privilege, to engage in the conduct claimed to have interfered with a contract.

██ We agree with the trial court that Prudential would be justified as a matter of law to communicate with its policyholders and CHE about certain subjects. As the trial court determined in its partial summary judgment:

> [Prudential] had an absolute right to communicate with its insureds regarding the claims that were billed against the insureds' policies; and that [Prudential was] not limited to communications that requested information regarding services rendered and statements of benefits paid; and that Defendants were not limited to any particular number of communications to their insureds.

Prudential is statutorily obligated to communicate with its insureds to acknowledge receipt of a claim, commence any investigation of the claim, and advise claimants of any actions taken with respect to the claim. *See* TEX.INS.CODE ANN. art. 21.55, §§ 2, 3 (Supp.2000).

██ With respect to Prudential's communications to CHE, the trial court determined in its partial summary judgment:

> [Prudential] had an absolute right to object to the bills, question[ ] the bills, investigate the bills, complain about the procedures used to come up with the bills, and to complain generally about the practice of late-charge billing.

Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997); *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 283 (Tex. 1996); *Calvillo v. Gonzalez,* 922 S.W.2d 928, 929 (Tex.1996). As Prudential was obligated only for reasonable charges under its policies, it had the contractual right to challenge the propriety of the FRS bills.

██ We, therefore, conclude that Prudential had a privilege to communicate with its insureds about claims against their policies and with CHE about the propriety of charges. But that does not mean that Prudential could say or do anything under the guise of exercising a privilege. A party may not exercise an otherwise legitimate privilege by resort to illegal or tortious means. As *Prosser and Keeton* observed:

> Methods tortious in themselves are of course unjustified and liability is appropriately imposed where the plaintiff's contract rights are invaded by violence, threats and intimidation, defamation, misrepresentation, unfair competition, bribery and the like.

KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 992 (5th ed.1984). Thus, if the plaintiff pleads and proves methods of interference that are tortious in themselves, then the issue of privilege or justification never arises.

Here, FRS pleaded that Prudential interfered with FRS's contracts and business relations by (1) falsely accusing FRS of double billing in letters to policyholders by referring to items as having been "previously considered"; (2) "maligning" FRS to CHE in a meeting by accusing FRS of billing for undocumented items that were documented; (3) harassing CHE with sham audits, requesting hundreds of records and asserting that CHE charged for medically unnecessary procedures; (4) pressuring CHE to stop using FRS by refusing to pay any FRS bill and withholding other claims until FRS was terminated; and (5) agitating the policyholders to complain about FRS.

██ Absent special exceptions, we construe a petition liberally in favor of the pleader. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). FRS pleaded that Prudential interfered with its business and contractual relations with HCA hospitals by "maligning" FRS to hospital officials and Prudential policyholders. Given a liberal construction, FRS's pleadings allege that Prudential interfered by conduct constituting business disparagement, a means of interference which is tortious in itself. *See Hurlbut v. Gulf Atl. Life Ins. Co.,* 749

S.W.2d 762, 766 (Tex.1987). The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages. *See id.* Accordingly, Prudential was privileged to speak to its policyholders and complain to CHE, but that privilege would not authorize Prudential to falsely and maliciously disparage FRS. Because Prudential would not be privileged to interfere with FRS's contract through means tortious in themselves, a directed verdict would not be proper if there is evidence that Prudential tortiously disparaged FRS.

To raise an issue of whether Prudential interfered with FRS's contract by tortiously disparaging FRS, there must be evidence that Prudential made statements rising to the level of trade disparagement. To do so, FRS must first present evidence that Prudential made false statements of fact about FRS. *See id.*

■ FRS argues that several instances show that Prudential intended to cause FRS to lose its HCA contracts by falsely accusing FRS of fraudulent business practices. FRS contends first, that the letters to the insureds accused it of fraudulent double billing. For example, one states:

> Please be advised that we have determined the late billings totaling $585.48 for the period of February 12, 1991 have been previously considered by Prudential. We have notified the hospital accordingly.

Sheryl Kapella, a registered nurse who cofounded FRS with Michael P. Lewis, testified at trial that this letter was false, because she could point to charges that Prudential had not considered from that time period. We disagree that sending the letters to the insureds constitute a tortious act by Prudential. Prudential has a legal duty to communicate with its policyholders about the status of potential claims. The letters merely inform the policyholder of the position Prudential took with respect to the bills, and do not disparage FRS in any way. There is no suggestion that FRS's actions or intentions were dishonest. Companies should be able to communicate frankly about disputes without fear of a claim by third parties for tortious interference. We conclude that the contents in Prudential's letters to its insureds did not make them tortious.

■ FRS also contends that Prudential falsely maligned FRS to CHE. Kapella claimed that one of Prudential's auditors told her that "they would like to see all firms like [FRS] go out of business." Kapella further testified that Prudential's auditors had asserted that FRS had double billed but she was able to convince them that they were mistaken. But later Prudential made the same accusations of double billing in front of CHE officials. Kapella said, "I was very upset at the mention I was double billing or fraudulently billing for items that weren't documented." Also, there was a letter from Gilbert, CHE's chief financial officer, to FRS's Lewis stating that he had heard that Prudential was spreading the word that FRS double billed and billed for service items that CHE normally did not bill.

■ The evidence is not conclusive about what Prudential's representatives actually said about FRS. Prudential clearly was entitled to challenge FRS's accounting methods and take the position that FRS's methods resulted in unfair charges. It also was entitled to disagree strongly, even in front of representatives of CHE, with the actions taken by FRS representatives. In matters of settlement, businesses should be given leeway to take, and express candidly, hard positions without risking tortious interference claims from third parties. But the right to challenge the bills would not entitle Prudential to falsely accuse FRS of fraud, knowing its charges are baseless. Here we must indulge all reasonable inferences in favor of FRS, the nonmovant. *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). That being the case, Kapella's testimony and Gilbert's letter are at least some evi-

dence that Prudential disparaged FRS's business by accusing it of fraud knowing the charge was baseless. We conclude Prudential did not establish its justification defense as a matter of law with respect to FRS's theory of tortious interference by business disparagement. If there is some evidence that Prudential caused FRS injury through tortious conduct, then directed verdict was not proper. And if the directed verdict was improper as to this theory, we need not resolve here whether FRS has sufficiently alleged any other acts of interference by means tortious in themselves. We turn now to Prudential's causation arguments.

## Causation

Prudential argues that there is no evidence that anything it did caused CHE to terminate its contracts with FRS. Prudential refers to the testimony of Judith Novak, CHE's chief executive officer, who testified that she terminated the contracts with FRS because of public relations problems caused by the late billing and her disagreement with FRS business practices, not because of anything Prudential said or did. However, under the proper standard for reviewing a directed verdict, we must disregard this evidence. *See Szczepanik*, 883 S.W.2d at 649.

We limit our inquiry here to whether there is evidence that Prudential's alleged business disparagement caused FRS injury. There is evidence that after the meeting between FRS, Prudential, and CHE, Novak directed FRS not to send out any further bills, and ultimately terminated FRS's contract. Also there is evidence that because of Prudential's allegations of double billing, an HCA official decided to prohibit HCA hospitals in the Western Region from doing any business with FRS. Thus we conclude there is some evidence that Prudential's alleged disparagement caused injury to FRS's contractual relations. Therefore, Prudential was not enti-

tled to a directed verdict on the issue of causation.

## Conclusion

In summary, we conclude that FRS's agency status did not create such a unity of interest with CHE so as to preclude FRS from suit for tortious interference with its auditing contracts. We also conclude Prudential did not conclusively negate causation, nor did it conclusively establish its justification defense. Thus, we hold that the trial court erred in directing a verdict for Prudential. Accordingly, we affirm the judgment of the court of appeals.

Justice HECHT filed a dissenting opinion, in which Justice OWEN and Justice BAKER joined.

Justice ENOCH filed a dissenting opinion, in which Justice OWEN and Justice BAKER joined.

Justice HECHT, joined by Justice OWEN and Justice BAKER, dissenting.

The Court concludes that Prudential was justified as a matter of law in writing to its insureds that it was being double-billed by their hospital, even if there was some evidence that its statements were false, but Prudential was not justified in complaining of double-billing *to the hospital itself*.[1] Any logic lurking in this reasoning eludes me. How can telling policyholders that their hospital is overbilling be more justified than telling the hospital to its face?

The Court says that Prudential had no right to falsely accuse FRS of fraud. In some circumstances, that would be true. But what harm does it do to tell X that Y is a fraud if X knows it is not true? The hospital could look at its own records and decide for itself whether FRS was overbilling. The hospital had no need to rely on Prudential's view on the subject; indeed,

1. *Ante* at 81.

the hospital had every reason to disbelieve Prudential.

In fact, the hospital did look at its records. And having looked, has it complained that Prudential forced it to terminate its relationship with FRS even though FRS was acting properly? No. The hospital takes the *opposite* position: that it terminated the relationship because it, too, was concerned about FRS's bills. How did Prudential disparage FRS's billing to the hospital *when the hospital itself was troubled by FRS's bills?*

The rule in this case is that if a person complains that he has been overcharged, and his creditor agrees and terminates its agent who sent the bill, the agent may sue the person who complained for tortious interference. I disagree with this rule and therefore dissent.

Justice ENOCH, joined by Justice OWEN and Justice BAKER, dissenting.

The Center for Health Excellence precipitated a fee dispute with an insurer of a number of the Health Center's patients when it hired a bill collecting firm, Financial Review Services. Financial Review promised the Health Center that it could find unbilled charges, that it would bill those who owed for uncharged services, and that the cost of its billing services would be a percentage of what it collected. Not surprisingly, when notified of charges due, the insurer was unpersuaded that services had been provided to its insureds for which it had, either directly or indirectly on behalf of its insureds, not been previously billed. And it fought back. But what is surprising, is this Court's conclusion that the insurer seemingly owes a duty to the bill collecting firm to not get it fired by the Health Center as a result of

the dispute. Because I believe that, as a matter of law, Financial Review cannot establish the elements of tortious interference with contract, I respectfully dissent.

To reach its decision, the Court initially concludes that although Financial Review is the Health Center's agent for collecting unbilled charges, that fact is no barrier to Financial Review's tortious interference with contract cause of action against Prudential. The Court then holds that Prudential did not conclusively establish that its interference with Financial Review's contracts was justified. But the fact that Financial Review *was* the Health Center's agent to collect the unbilled charges against Prudential *is* the dispositive fact.

Only a stranger to a contract can tortiously interfere with that contract.[1] The parties to a contract, therefore, cannot as a matter of law tortiously interfere with that contract.[2] Nor can the parties' agents while they are acting in their principals' interests.[3] The efficacy of this latter proposition is self-evident in the context of corporate entities. Corporations cannot act but through agents, who are usually but not always, its employees.[4] Necessarily then, Texas law views a principal and its agent as the same legal entity when the agent deals with others on behalf of the principal.[5]

Holding, as the Court does, that one contracting party may be exposed to tort liability for the firing of the other party's agent unduly muddles this established principle. Moreover, the decision's effect is heedless of the potential for unlimited expansion of the tort. For example, any employee of the Health Center who is discharged by the Health Center because of the Health Center's dispute with Pru-

---

**1.** *See Morgan Stanley & Co. v. Texas Oil Co.,* 958 S.W.2d 178, 179 (Tex.1997) (citing *Holloway v. Skinner,* 898 S.W.2d 793, 797 (Tex. 1995)).

**2.** *See Baker v. Welch,* 735 S.W.2d 548, 549 (Tex.App.-Houston [1 st Dist.] 1987, writ dism'd).

**3.** *See Morgan Stanley,* 958 S.W.2d at 179.

**4.** *See Holloway,* 898 S.W.2d at 795.

**5.** *Morgan Stanley,* 958 S.W.2d at 182 (Enoch, J., concurring).

dential will have a cause of action for tortious interference with contract against Prudential. But the foundation of agency law is that the agent and its principal are the same entity with respect to the principal's contracting party. A corollary proposition then is that the contracting party cannot be a third-party to the other party's agency relationship. Because in this case Financial Review is the same entity as the Health Center as far as Prudential is concerned, Financial Review cannot establish the elements of tortious interference with a contract for its claim against Prudential.

The Court errs in permitting Financial Review to act as the Health Center's agent in billing Prudential and then allowing it to interpose its agency contract to split its identity from the Health Center, enabling it to hold Prudential liable for its being fired because Prudential objected to that billing. The great flaw in the Court's adopting Financial Review's theory that it can sue Prudential for tortiously interfering with its agency contract is that this theory potentially converts into a tort every breach of contract claim when one party to the contract is represented by an agent. The mischief of the Court's reasoning is particularly evident in this case. Here, the Health Center has not even claimed that its contract with Prudential has been breached, but rather it fired its agent for mishandling that contract.

The Court, rejecting Prudential's position, asserts that Prudential asks us to draw too broad a principle—that an agent cannot sue a third-party for tortious interference with its agency contract. But the Court recasts Prudential's argument in order to avoid a critical element of the argument. Prudential is not a third-party to Financial Review's agency contract with the Health Center because that contract makes Financial Review one with the Health Center with respect to Prudential. This does not foreclose actions against true

third-parties. Another bill auditing company seeking to replace Financial Review, for example, could interfere with Financial Review's agency contract with the Health Center. This is so because Financial Review's agency contract does not make it one with the Health Center with respect to this other auditing company. As well, were Prudential to have engaged in some conduct, not related to its dispute with the Health Center over the billing, with the intent that Financial Review's agency be terminated, then that would be tortious interference. And this is so because outside the context of Prudential's contract with the Health Center, Prudential would not be dealing with Financial Review as the Health Center's agent.

Finally, the Court suggests that the concerns in *Morgan Stanley* [6] and *Holloway* [7] are not present here, and that those cases are therefore inapposite. But the Court errs in its judgment because in its reasoning, it too easily dismisses these cases. On the surface, *Morgan Stanley* and *Holloway* can be distinguished because in those cases the principal's agent did not sue, but *was* sued, for tortious interference. Below the surface of those decisions, though, underlies the agency principle that pervades this decision.

Both cases are predicated on the principle that because principals and agents are legally the same entity, they are both considered party to a contract the principal makes with another. And both cases recognize that if both principal and agent are party to a contract for which tortious interference is alleged, the tort is confounded because parties to a contract cannot tortiously interfere with it as a matter of law. Consequently, to allow the claim to proceed, the Court had to identify some factor that would separate the legal identity of principal and agent such that the agent could be considered a third-party to the contract. Thus, those cases held that when agents are sued for tortious interfer-

---

6. 958 S.W.2d 178.

7. 898 S.W.2d 793.

ence by a party to the principal's contract, the agents are only liable if they break the identity of interests between principal and agent by acting in their own self-interest at the expense of the principal's.[8]

Here, by contrast, it is not even suggested that Financial Review's identity of interests that bonded its legal identity to that of its principal was abrogated. And *Holloway* flatly states that "[w]hen there is a complete identity of interests [between principal and agent], there can be no interference as a matter of law." [9]

### Conclusion

Financial Review was hired by the Health Center to negotiate on its behalf for payment of previously unbilled services from Prudential. As a matter of law, Financial Review, the agent, and the Health Center, the principal, are the legal equivalent for the purposes of bill collecting under the Health Center's contract with Prudential. Now that it has been fired, Financial Review cannot cleave its legal identity from that of the Health Center's and point to its agency contract in order to claim tortious interference with contract. Because as a matter of law Prudential is not a third-party to Financial Review's agency relationship with the Health Center, Financial Review cannot establish the elements of tortious interference with contract as a matter of law. Therefore the court of appeals' judgment should be reversed. I respectfully dissent.

---

8. *See Morgan Stanley,* 958 S.W.2d at 179 (quoting *Holloway,* 898 S.W.2d at 797.).

9. *Holloway,* 898 S.W.2d at 797.