**Opinion issued September 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00617-CV

———————————

**BOB DEUELL, Appellant**

**V.**

**TEXAS RIGHT TO LIFE COMMITTEE, INC., Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-32179**

---

## DISSENTING OPINION

[A] calculated falsehood, inserted into the midst of a heated political campaign, can unalterably distort the process of self-determination. For the use of a known lie . . . is at once at odds with the premises of democratic government and the orderly manner in which economic, social, and political change is to be effected.   Half-truths strung

misleadingly together are no less destructive of democracy than an outright lie.[1]

Because the majority errs in concluding that appellee, Texas Right to Life Committee, Inc. ("TRLC"), established by clear and specific evidence a prima facie case for each essential element of its claims of tortious interference with contract against appellant, former state Senator Bob Deuell, I respectfully dissent.

In the May 4, 2014 Texas Republican Primary election, Deuell, a sitting Texas State Senator, sought re-election. Days later, with Deuell facing a challenger in the May 27, 2014 run-off election, TRLC produced a radio advertisement about Deuell's sponsorship in 2013 of Senate Bill 303, "relating to advance directives and health care and treatment decisions."[2] The script of the advertisement reads as follows:

> Before you trust Bob Deuell to protect life, please listen carefully. If your loved one is in the hospital, you may be shocked to learn that a faceless hospital panel can deny life-sustaining care[—]giving you only 10 days to find another facility for your mother, dad, or young child even if the patient is conscious. Your civil liberties and your right to life should not go away once you are in the hospital. This actually happens to families across Texas, and Bob Deuel[l] sponsored a bill to give even more power to these hospital panels over life and death for our ailing family members. Bob Deuell turned his back on life and on disabled patients. Don't trust him to protect you if you are sick. . . .

---

[1]     *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 137 (Tex. 2000) (Baker, J., joined by Enoch, J., and Hankinson, J., concurring in part and dissenting in part) (internal quotations omitted).

[2]     TEX. S.B. 303, 83rd Leg., R.S. (2013).

And TRLC contracted with Cumulus Media Dallas–Fort Worth ("Cumulus") and Salem Communications ("Salem") to broadcast its advertisement on their radio stations.

Subsequently, Deuell sent a series of cease-and-desist letters to the radio stations, complaining that TRLC's advertisement was false and defamatory.[3] He

---

[3] Senate Bill 303 actually proposed to ***extend*** *from ten days to fourteen days* the time to transfer a patient to an alternative health care provider. *Compare* TEX. HEALTH & SAFETY CODE ANN. § 166.046(e) (Vernon 2010 & Supp. 2016) (physician and health care facility "not obligated to provide life-sustaining treatment after the 10th day" after ethics committee's written decision regarding withdrawal of life-sustaining treatment), *with* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 303, 83rd Leg., R.S. (2013) (physician and health care facility "not obligated to provide life-sustaining treatment after the 14th day"). Senate Bill 303 also proposed to ***extend*** *from 48 hours to 7 days* the family notification period in advance of an ethics committee meeting regarding a decision to withhold or withdraw life-sustaining treatment. *Compare* TEX. HEALTH & SAFETY CODE ANN. § 166.046(b) (patient or family must be "informed" of review process "not less than 48 hours before" meeting), *with* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 303, 83rd Leg., R.S. (2013) (committee "required," "not later than the seventh calendar day before" meeting regarding decision to withhold or withdraw life-sustaining treatment, to provide patient or "surrogate" (family member or clergy) with "written description" of review process and "notice" of "entitle[ment]" to second opinion and to "attend and participate in" meeting). Senate Bill 303 also increased a health care provider's duty to inform a patient's family prior to withholding or withdrawing life-sustaining treatment. *Compare* TEX. HEALTH & SAFETY CODE ANN. § 166.039(b) (Vernon 2010 & Supp. 2015) (authorizing "attending physician and one person," including a patient's spouse, adult child, parent, or relative, "if available," to make decision to "withhold or withdraw life-sustaining treatment"), *with* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 303, 83rd Leg., R.S. (2013) ("[r]equiring" attending physician and health care facility to make "reasonably diligent effort to contact" family or clergy). Further, Senate Bill 303 increased the accountability of health care providers. *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 303, 83rd Leg., R.S. (2013) (requiring facilities to report number of cases in which ending life-sustaining treatment considered and their disposition).

attached to his letters a statement by the Texas Catholic Conference. In their statement, the Catholic Bishops of Texas endorsed Senate Bill 303 as follows, in pertinent part:

> Texas Catholic Bishops joined a coalition of the state's largest pro-life organizations, healthcare providers, and religious denominations to endorse legislation introduced by state Senator Robert Deuell . . . to improve the state's handling of end-of-life care in a way that balances the protections of human life and a medical provider's conscience (SB 303).
>
> Senate Bill 303 would reform the Texas Advance Directives Act of 1999 . . . to improve the statute's clarity and consistency about many ethical decisions amid the complexity of end-of-life care. For instance, the current statute contains definitions that could be interpreted to allow for the premature withdrawal of care for patients who may have irreversible, but non-terminal, conditions; fails to ensure that all patients are provided with basic nutrition and hydration; and falls short in ensuring the clearest and most compassionate communication between medical professionals and patient families when disagreements arise.
>
> The reforms set forth by Sen. Deuell's bill address those shortcomings by empowering families and surrogates, [and] protecting physicians and other providers . . . . Senate Bill 303 also earned the endorsement of the Texas Medical Association, Texas Hospital Association, Catholic Health Association – Texas, Texas Alliance for Life, and the Baptist General Convention of Texas.

Texas Catholic Conference, *Texas Bishops Endorse SB 303 [t]o Improve End-[o]f-Life Care* (Jan. 31, 2013), http://www.txcatholic.org/news/300-bishops-applaud-advance-directives-reform-bill (attached as an appendix to this opinion).

After the Cumulus and Salem radio stations suspended the airing of TRLC's advertisements, TRLC purchased a new advertisement to air on the stations, and it contracted for airtime with CBS Radio Texas ("CBS"). And after Deuell was defeated in the run-off election, TRLC filed the instant suit against him, alleging

4

that he had tortiously interfered with its contracts with Cumulus and Salem. Deuell moved to dismiss the suit under the Texas Citizens Participation Act (the "TCPA").[4] And the trial court denied his motion.

In his first issue, Deuell argues that the trial court erred in denying his motion to dismiss TRLC's lawsuit because his communications to Cumulus and Salem related to his exercise of free speech and TRLC failed to establish a prima facie case for its claims of tortious interference with contract.

The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (Vernon 2015). It "protects citizens from retaliatory lawsuits that seek to intimidate or silence them" from exercising their First Amendment freedoms and provides a procedure for the "expedited dismissal of such suits." *In re Lipsky*, 460 S.W.3d 579, 584, 586 (Tex. 2015); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Vernon 2015). It is intended to identify and summarily dispose of lawsuits "designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d at 589. And it is to be "construed liberally to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE ANN. § 27.011(b).

---

[4] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Vernon 2015).

5

A defendant who believes that a lawsuit is based on his valid exercise of First Amendment rights may move for expedited dismissal of the suit. *In re Lipsky*, 460 S.W.3d at 586. The defendant must first show "by a preponderance of the evidence" the applicability of the TCPA, that is, that the plaintiff's claim is "based on, relates to or is in response to the [defendant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* at 586–87 (internal citations omitted); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). The first step of the inquiry is a legal question that we review de novo. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

If the initial showing is made, the burden then shifts to the plaintiff to establish by "clear and specific evidence" a prima facie case for each essential element of its claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587–88; *Newspaper Holdings, Inc.*, 416 S.W.3d at 80. "The words 'clear and specific' in the context of this statute have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'" *Lipsky*, 460 S.W.3d at 590 (quoting BLACK'S LAW DICTIONARY 268, 1434 (8th ed. 2004)); *see KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston 1st [Dist.]

2013, pet. denied). In contrast, a "prima facie case" has a "traditional legal meaning." *Lipsky*, 460 S.W.3d at 590. "It refers to evidence *sufficient as a matter of law to establish a given fact* if it is not rebutted." *Id.* (emphasis added). Thus, "pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement." *Id.* at 590–91 ("Mere notice pleading . . . will not suffice."). "[A] plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 591.

In determining whether a legal action should be dismissed, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). We review the pleadings and evidence in a light favorable to the plaintiff. *Newspaper Holdings, Inc.*, 416 S.W.3d at 80–81. If the defendant's constitutional rights are implicated and the plaintiff has not met the required showing of a prima facie case, the trial court must dismiss the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005.

Here, Deuell asserted in his motion to dismiss that TRLC's lawsuit against him is based on his exercise of the right of free speech. *See Lipsky*, 460 S.W.3d at 586–87. The TCPA defines the "[e]xercise of the right of free speech" as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A "communication" includes the "making

7

or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id*. § 27.001(1). A "matter of public concern" includes an issue related to: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id*. § 27.001(7).

The record shows that TRLC's claims are based on Deuell's statements, which were contained in letters he wrote to the radio stations running TRLC's advertisement, complaining that it had misrepresented the purpose and effect of legislation he had sponsored as a senator for the State of Texas. The complained-of statements constitute "communications," as defined in the statute. *See id*. § 27.001(1). Further, the statements regard a "matter of public concern," as defined, because they concern issues related to the government and a public official, i.e., Deuell's comment on political advertisements relating to him, as a senator, during an election, concerning legislation that he sponsored in the Texas Senate. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7).

Because Deuell established that the TCPA applies to TRLC's claims against him, the burden then shifted to TRLC to establish by "clear and specific evidence" a prima facie case for each essential element of its claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 586–87; *Newspaper*

8

*Holdings, Inc.*, 416 S.W.3d at 80. The elements of TRLC's claims for tortious interference with contract are (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract by Deuell, (3) that proximately caused TRLC injury, and (4) "caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs. Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

TRLC asserts that it had contracts with Cumulus and Salem for the broadcasting of its advertisement leading up to the May 27, 2014 run-off election. Deuell interfered with TRLC's contracts by threatening litigation against the radio stations if they did not suspend the broadcasting of its advertisement. His letters resulted in the two radio stations suspending TRLC's advertisement and caused it to lose two days of airtime. And TRLC was forced to purchase a new advertisement and contract for airtime with CBS.

As evidentiary support, TRLC presented the affidavit of its executive director, James J. Graham. In his affidavit, Graham testified that on May 6, 2014, TRLC contracted with Malone Media Design ("Malone") to produce a radio advertisement for the Dallas and Fort Worth media markets concerning Deuell's "voting record" for $450. On May 7, 2014, TRLC entered into a contract with Cumulus for the placement and airing of the radio advertisement for "approximately $17,935." And on May 8, 2014, TRLC entered into a contract

9

with Salem for the placement and airing of the radio advertisement for "approximately $22,015."

According to Graham, Cumulus and Salem, on May 14, 2014, notified TRLC that they had received "legal threats" from Deuell based on TRLC's advertisement and they were suspending its airing. "As a compromise to resume airing [of TRLC's] radio advertisement, given the concerns of [Cumulus] and [Salem], [TRLC] agreed to produce a new radio advertisement and replace the original radio advertisement. . . ." TRLC returned to Malone and "had another radio advertisement produced and delivered" to Cumulus and Salem. And, as a "remedial measure[]," TRLC also "contracted with [CBS]" to purchase "additional airtime in the Dallas/F[ort] Worth media market for the new radio advertisement" for "approximately $15,037."

Graham's testimony, standing alone, does not establish the existence of a contract. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *see also Serafine v. Blunt*, 466 S.W.3d 352, 361 (Tex. App.—Austin 2015, no pet.). In *Serafine*, the Blunts alleged that Serafine tortiously interfered with their contract with a drainage and foundation company to install a pump-and-drain system on their property. 466 S.W.3d at 361. Seraphine threatened the company's employees while they worked, and she threatened the company with litigation, resulting in its decision "not to continue the contracted-for work" and causing the Blunts to have to "pay

10

more for the work." *Id.* Pursuant to the TCPA, Serafine moved to dismiss the Blunts' claim against her. *Id.* Mr. Blunt, in his affidavit in response to Serafine's motion, testified that he had "hired [the company] to professionally install a pump and drain system." *Id.* At a hearing, he explained that he had hired it "to resolve a drainage problem that was causing water to gather under his house." *Id.* And it was "going to install French drains around the property and against the border of his house that would tie into a sump pump that would pump the water out to a pop-out valve so it would flow down into the street." *Id.* The Austin Court of Appeals held that the Blunts had "failed to establish a prima facie case for [the contract] element of their claim" because "Mr. Blunt did not provide *detail about the specific terms* of the contract or attach to his affidavit any contract or other document memorializing any agreement between the Blunts and the drainage company about the scope of work to be done." *Id.* at 361–62 (emphasis added).

This Court recently reached the same conclusion in a case with similar facts. *See Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). In *John Moore*, we held that the nonmovant had "failed to establish by clear and specific evidence the essential element of the existence of a contract" because it did not present evidence regarding "*the terms*" of any of its contracts with its customers or

the Better Business Bureau chapters. *Id.* (emphasis added). Rather, the nonmovant merely asserted that contracts existed.[5] *Id.*

Here, Graham, in his testimony, presented even less detail about the terms of TRLC's contracts with Cumulus and Salem than did Blunt in his affidavit in *Seraphine*. *See* 466 S.W.3d at 361–62. Graham's testimony does not constitute "clear and specific evidence" of "the terms" of any contract. *See id.* at 361; *John Moore Servs., Inc.*, 441 S.W.3d at 361; *see also All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied) (general statement contracts existed insufficient to maintain tortious-interference-with-contract claim where affidavit provided no "detail as to specific terms" of contracts and no contract attached "to serve as an exemplar"). Thus, TRLC did not establish a prima facie case for the existence of a contract. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *see also Lipsky*, 460 S.W.3d at 590–91 (plaintiff "must provide enough detail to show the factual basis of its claim" and present "evidence

---

[5]    In support of its holding, the majority relies, in part, on *Martin v. Bravenec*, No. 04-14-00483-CV, 2015 WL 2255139, at *7 (Tex. App.—San Antonio May 13, 2015, pet. denied). In *Martin*, the San Antonio appellate court's entire analysis "[w]ith regard to the existence of a contract," is as follows: "[T]he pleadings alleged the appellees have a contract to sell the Property, and Bravenec identified the name of the prospective purchaser at the hearing." *Id.* As discussed, this Court has previously held that merely alleging that a contract exists is insufficient to establish "by clear and specific evidence the essential element of the existence of a contract." *See Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Further, identifying a "prospective purchaser" alone does not establish "the terms" of a contract. *See id.*

12

*sufficient as a matter of law to establish a given fact* if it is not rebutted" (emphasis added)).

Graham's testimony also does not establish that Deuell committed a willful and intentional act of interference with any contract. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. A willful and intentional interference requires evidence that the defendant "knowingly induced" a contracting party to breach its obligations. *Serafine*, 466 S.W.3d at 362; *see also John Paul Mitchell Sys. v. Randalls Food Mkts.*, 17 S.W.3d at 721, 730 (Tex. App.—Austin 2000, pet. denied). Graham's conclusory testimony about the existence of a contract is insufficient to establish a breach of any of specific contract provision. *See All Am. Tel., Inc.*, 291 S.W.3d at 532. Further, TRLC was required to provide "clear and specific evidence" that "some *obligatory* provision" of the contract was breached. *Id.* (emphasis added).

"Inducing a contract obligor to do what it has a right to do is not an actionable interference." *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). A licensed[6] radio broadcasting station is, with the very narrow

---

[6] The Communications Act of 1934 (the "Act") "forbids any person from operating a broadcast station without first obtaining a license" from the Federal Communications Commission. *United States v. Midwest Video Corp.*, 406 U.S. 649, 679, 92 S. Ct. 1860, 1876 (1972) (Douglas, J., joined by Stewart, J., Powell, J., and Rehnquist, J., dissenting) (citing 47 U.S.C. § 301). The Act extends "to all interstate and foreign communication by wire or radio . . . which originates and/or is received within the United States." *Id.* (citing 47 U.S.C. § 152(a)).

exception of advertising by political candidates,[7] "obliged to reserve to [itself] the final decision" as to the content it will air. *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 205, 63 S. Ct. 997, 1004 (1943) ("[A] licensee has the duty of determining what [content] shall be broadcast over [its] station's facilities."); *see also McIntire v. Wm. Penn Broad. Co. of Pa.*, 151 F.2d 597, 601 (3d Cir. 1945) ("[A] radio broadcasting station is not a public utility in the sense that it must permit broadcasting by whoever comes to its microphones.").

Moreover, a licensed radio station "must operate in the public interest." *United States v. Midwest Video Corp.*, 406 U.S. 649, 679, 92 S. Ct. 1860, 1876 (1972) (Douglas, J., joined by Stewart, J., Powell, J., and Rehnquist, J., dissenting) (citing 47 U.S.C. §§ 308–09); *see also Nat. Broad. Co.*, 319 U.S. at 205, 63 S. Ct.

---

[7] If a licensee permits "any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station." 47 U.S.C. § 315(a), (b)(2)(D) ("A candidate meets the requirements of this subparagraph if, in the case of a radio broadcast, the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast."); *see also KENS-TV, Inc. v. Farias*, No. 04-07-00170-CV, 2007 WL 2253502, at *3 (Tex. App.—San Antonio Aug. 8, 2007, pet. denied) (mem. op.) (discussing "use" advertisements under section 315(a)). A licensee has "no power of censorship over the material broadcast" in a "use" advertisement. 47 U.S.C. § 315(a). And because the broadcaster cannot censor the candidate's materials, it is immune from state libel claims. *Farmers Educ. & Coop. Union of Am. v. WDAY, Inc.*, 360 U.S. 525, 528, 535, 79 S. Ct. 1302, 1305, 1308 (1959); *see also Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 516 (Tex. App.—Austin 1991, writ denied). However, because third-party groups, like TRLC, are not "legally qualified candidate[s]," they are not subject to the "no censorship" provisions of section 315(a), and radio stations can be held liable for the content of their advertising.

14

at 1004 ("It is the station, not the network, which is licensed to serve the public interest."). The Federal Communications Commission ("FCC"), "in determining whether a licensee's operation has served the public interest, considers whether [it] has complied with state and local regulations governing advertising." *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 445, 83 S. Ct. 1759, 1771 (1963). And the National Association of Broadcasters "unmistakably enjoins each member to refuse the facilities of his station to an advertiser where he has good reason to doubt the integrity of the advertiser, the truth of the advertising representations, or the compliance of the advertiser with the spirit and purpose of all applicable legal requirements." *Id.* at 446, 83 S. Ct. at 1771.

Thus, for a radio station to execute an agreement to "broadcast all advertisements tendered to [it], without qualification" would constitute an "illegal" contract because a licensee "cannot lawfully delegate [its] duty or transfer the control of [its] station" to another. *Nat'l Broad. Co.*, 319 U.S. at 205, 63 S. Ct. at 1004; *Traweek v. Radio Brady, Inc.*, 441 S.W.2d 240, 242 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.); *see also* 47 U.S.C. § 310(d) (prohibiting transfer of licensing or control except by application to FCC). Notably, a contract that is illegal or contrary to public policy cannot serve as the basis for a claim of tortious interference with contract. *Wa. Square Fin., LLC v. RSL Funding, LLC*, 418 S.W.3d 761, 771 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Here, because TRLC did not present any of the details about the terms of its contracts with Cumulus and Salem, it did not present "clear and specific evidence" that an "*obligatory* provision" of the contracts was breached.[8] *See All Am. Tel*., 291 S.W.3d at 532 (emphasis added).

Further, Graham's testimony does not present clear and specific evidence establishing a prima facie case that Deuell's actions "caused actual damages or loss." *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. Graham, in his affidavit, asserts only the price paid for each contract and that some portion of each was not performed. Further, Graham, in his affidavit, does not present any of the details of TRLC's new contract with CBS, i.e., when it was executed, when the "remedial" advertisements began airing, how many spots were aired, or when they stopped.

At the hearing on Deuell's motion to dismiss, the following exchange took place between the trial court and counsel for TRLC:

---

[8] The majority asserts that "TRLC did not bear the burden to disprove the existence of Deuell's potential defenses." The Texas Supreme Court has rejected similar reasoning in another case involving a claim for tortious interference with contract. *See ACS Inv'rs v. McLaughlin*, 943 S.W.2d 426, 431 (Tex. 1997). There, McLaughlin similarly asserted that ACS's argument that its action was authorized under the contract and was therefore not subject to interference constituted an attempt to raise a defense. *Id*. The court explained that establishing the existence of a *contract subject to interference* constituted an essential element of McLaughlin's prima facie case. *Id.* And the existence of a defense was "not an issue." *Id.* The court concluded that because the evidence revealed that the agreement was not subject to the tortious interference allegation, ACS did not interfere as a matter of law and need not prove a defense to avoid liability. *Id.* ("The focus in evaluating a tortious interference claim begins, and in this case remains, on *whether the contract is subject to the alleged interference*.") (emphasis added).

| THE COURT: | You were off the air for two days? |
| TRLC: | We were off the air for two days. |
| THE COURT: | How are you going to—this is just a curiosity here. How are you going to prove damages for the two days? |
| TRLC: | I can do it right now. I can prove them almost to the penny, and I can—I can put on a witness who we're prepared to do. |
| THE COURT: | That's not part of this Motion. As I said, that was a curiosity on my part. |

As an element of its prima facie case, however, TRLC was required to present evidence of its damages. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. And TRLC presented no such evidence at the hearing.

Again, a "prima facie case" "refers to evidence *sufficient as a matter of law to establish a given fact* if it is not rebutted." *Lipsky*, 460 S.W.3d at 590 (emphasis added). "[B]aseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Id.* at 592. TRLC was required to "provide enough detail to show the factual basis of its claim[s]." *Id.* at 591; *see, e.g.*, *Tex. Campaign for the Env't v. Partners Dewatering Int'l, LLC*, 485 S.W.3d 184, 199–200 (Tex. App.—Corpus Christi 2016, no pet.) (affidavit testimony set out damages model, considerations upon which damages were based, and included costs up to time of contract cancellation).

17

Graham's testimony shows that TRLC did not merely pay Malone to produce a new commercial for Cumulus and Salem pursuant to the "compromise" that TRLC struck "to resume airing [of its] radio advertisement[]." Rather, TRLC signed a new contract with CBS, the terms of which it did not present to the trial court. And, according to Graham, TRLC paid just $450 to Malone to produce the original advertisement and $17,935 and $22,015 to Cumulus and Salem, respectively, to broadcast it over the total contract period. Nevertheless, TRLC asserts that it was forced to spend over $15,000 to cure the lost airtime, which Graham does not quantify in his affidavit, but TRLC's counsel explained at the hearing constituted only a two-day period. "[O]pinions must be based on demonstrable facts and a *reasoned basis*." *In re Lipsky*, 460 S.W.3d at 593 (emphasis added).

In sum, TRLC presented *no evidence* to establish any of the elements of its claims against Deuell for tortious interference with contract. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. Deuell established that the TCPA applies to the claims against him, and TRLC did not present clear and specific evidence establishing a prima facie case of each of the elements of its tortious-interference claims. Accordingly, I would reverse the trial court's order and render judgment dismissing TRLC's claims against Deuell.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Huddle.

Jennings, J., dissenting.



Join the
Texas
Catholic
Network

THE PUBLIC POLICY VOICE OF THE CATHOLIC BISHOPS OF TEXAS

Search
Select Language | ▼

Home    Bishops    About Us    News    Education    Archives    Public Policy    Resources    Contact



Policy
Issues

Shepherds
Speak

- Immigration: A Different Narrative
- Payday Lending
- Meditation Candlemas

## Lone Star Catholic

## Church in Texas

- Many Head to the Capitol in Support of Life
- World War II Veteran Works on the Home Front to Promote Religious Vocations
- Folklife Mass: 'One Faith – Many Cultures'

## News

- TCC- DACA Project
- Texas Catholic Conference Seeks Federal Extension Of Children's Health Insurance Program
- The Perils Of Payday And Auto Title Lending



TEXAS VOICE
In this Issue:

USCCB Migration Committe Traveled To U.S.-Mexican Border

# Texas Bishops Endorse SB 303 To Improve End-Of-Life Care

January 31, 2013

Texas' Catholic Bishops joined a coalition of the state's largest pro-life organizations, healthcare providers, and religious denominations to endorse legislation introduced by state Senator Robert Deuell (R-Greenville) to improve the state's handling of end-of-life care in a way that balances the protections of human life and a medical provider's conscience (SB 303)

Senate Bill 303 would reform the Texas Advance Directives Act of 1999 (TADA), to improve the statute's clarity and consistency about many ethical decisions amid the complexity of end-of-life care. For instance, the current statute contains definitions that could be interpreted to allow for the premature withdrawal of care for patients who may have irreversible, but non-terminal, conditions; fails to ensure that all patients are provided with basic nutrition and hydration; and falls short in ensuring the clearest and most compassionate communication between medical professionals and patient families when disagreements arise

The reforms set forth by Sen. Deuell's bill address those shortcomings by empowering families and surrogates, protecting physicians and other providers from having to provide morally unethical treatment, and avoiding the continuing threats of frivolous lawsuits. Senate Bill 303 also earned the endorsement of the Texas Medical Association, Texas Hospital Association, Catholic Health Association-Texas, Texas Alliance for Life, and the Baptist General Convention of Texas.

Reforming the Advance Directive Act has been a top priority for the Texas Catholic Conference in the 83rd Texas Legislature, as the Catholic Church strongly believes that respect for life is lifelong – from conception to natural death.

"The bishops of Texas have long sought to reform end-of-life care laws in a way that promotes and protects the life of individuals in the natural process of dying. We believe that in end-of-life decisions, any legislation should prioritize the patient, while also recognizing the emotional and ethical concerns of patients, families, and health care providers, to provide the most compassionate care possible," said Daniel Cardinal DiNardo, of the Diocese of Galveston-Houston.

"Respect and care for the life and personal dignity of the dying patient should be the goals of every individual and institution involved in the process. We are pleased that Senator Deuell's bill accomplishes these goals by explicitly excluding any form of euthanasia and rejecting an abusive extension of the death process," Cardinal said

The reforms suggested in Senator Deuell's address a number of principles, including:

- Improving notification and appeal processes for families or surrogates when a Do-Not-Resuscitate Order is used.

- Ensuring that artificially administered nutrition and hydration cannot be withdrawn from a patient, unless continuing to provide that treatment would harm the patient;

- Ensuring the process is applied only to patients for whom life-sustaining treatment would be medically inappropriate and ineffective, and are difficult for the patient to endure;

- Respecting the conscience of physicians and other health care providers so the law does not require them to provide unethical treatment;

- Extending the notification time to a family or surrogate from 48 hours to seven days in advance of an ethics committee meeting;

- Extending the time to find an alternative willing provider from 10 to 14 days;

- Providing the family or surrogate with a patient liaison to help guide them through the process;

- Providing the family or surrogate with a free copy of the patient's medical record.

- Inviting the family or surrogate to attend the ethics committee meeting at which future care for their loved one will be



EXHIBIT
A

discussed; and,

• Creating reporting requirements for hospitals or hospital systems that have one or more ethics committee meetings on the process outlined in the bill.

s          s          8•1   6                    1
                                                2

Pope Names Cardinal DiNardo To New Council For The Economy

Senate Bill Affirms Parental Choice In Child Care Bill

Heritage Edition Of The St. John's Bible Visits Houston

Child Protective Services Introduces CHILD Program to Amarillo Diocese

© 2013 Texas Catholic Conference
Phone: (512) 339-9882   •   Fax: (512) 339-8670

Physical Address: 1600 North Congress Avenue, Suite B, Austin TX 78701
Mailing Address: P.O. Box 13285, Austin, TX 78711

The Texas Catholic Conference is the association of the Roman Catholic Bishops of Texas. We accredit the state's Catholic Schools, maintain records that reflect the work of the Church in Texas, and represent the Bishops in the public policy sphere.

TCC HOME     BISHOPS     MARRIAGE FORMS     SITE MAP     CONTACT     PRIVACY     USCCB     VATICAN

EXHIBIT
A