# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00707-CV

**CoreALM, LLC, Appellant**

**v.**

**Keen Fusion, Inc., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
## NO. D-1-GN-15-000883, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

CoreALM, LLC, appeals the trial court's judgment rendered on a jury verdict awarding Keen Fusion, Inc., $116,509 in damages for tortious interference with contract and business disparagement. On appeal, CoreALM contends that the economic loss rule barred an award of damages based on tort claims and that the evidence was legally insufficient to support the jury findings that CoreALM tortiously interfered with a contract and disparaged the business of Keen Fusion. We will affirm.

## BACKGROUND

CoreALM is a company that provides consulting services related to SAP software, specializing in application lifecycle management.[1] Keen Fusion, a company owned solely by Nathan

---

[1] SAP software is enterprise resource planning software used by large companies to manage their businesses. Application lifecycle management is the supervision of a software application from its initial planning through retirement and also refers to how changes to an application are documented and tracked.

Williams, also specializes in a certain product within SAP. In June 2013, Williams contacted CoreALM through LinkedIn and informed it that he would soon be available as an independent consultant and would be interested in any potential opportunities to "partner in the ALM space." Williams informed CoreALM that he was only interested in "a straight rate non-exclusive arrangement." In April 2014, CoreALM and Williams began discussing a potential placement with Warner Brothers. Williams testified that CoreALM asked Keen Fusion to sign a Bilateral Subcontract Agreement (BSA) and a Non-Disclosure Agreement (NDA) in anticipation of working on the Warner Brothers project. The BSA states that its object is to provide an agreement between CoreALM and Keen Fusion for marketing, project delivery, and other activities related to the two companies working together on consulting tasks and opportunities. The BSA includes the following provisions:

> **Prime Role.** Typically, the party which first identifies the prospect shall serve as prime contractor and the other party shall serve as the subcontractor, however, when the interests of the client or other circumstances so indicate, the parties may agree that the party which first identifies the prospect may serve as the subcontractor with the other party serving as the prime contractor. For each project on which the parties agree to team together pursuant to this agreement, the parties shall execute a schedule to this agreement which shall set forth the name of the client or prospect, a description of the project, a description of the tasks to be performed by the subcontractor and all other relevant matters, including billing rates.

> **Client Non-Competition.** Each party agrees that it will respect the other party's priority right of relationship with customers introduced by the other party. To the extent that one party introduces a new customer to the other party, the other party will not, during the term of this agreement and for a period of one (1) year afterward, solicit business from such customer in the other party's field of expertise, except in connection with the introducing party. This is limited to clients introduced directly by the partner and does not affect business derived from marketing performed independently.

The BSA also made clear that each party remained an independent contractor and that nothing in the BSA could be construed to bind either party to an exclusive working relationship. The Warner Brothers project was not awarded to CoreALM or Keen Fusion and neither party did any work for Warner Brothers.

In July 2014, Williams was contacted by Maria Upton, an employee of a staffing company called eCommQuest, regarding an opportunity to provide SAP-related consulting services. The arrangement that was proposed was that Keen Fusion would become a subcontractor of Ernst & Young, which was working on an engagement for Johnson Controls, Inc., in Milwaukee, Wisconsin. Upton arranged for Williams to have a telephone interview with representatives of both Ernst & Young and Johnson Controls to discuss a five-month consulting project. After the interview, Ernst & Young confirmed that it would retain Keen Fusion for the Johnson Controls project. Keen Fusion and eCommQuest then executed a contract whereby Keen Fusion retained the services of eCommQuest to act as a brokering agent for Keen Fusion to provide services to Ernst & Young and Johnson Controls for five months. Williams testified that Keen Fusion was to be paid an hourly rate of $165 and that he was scheduled to start the five-month project on August 25, 2014.

During this time period, CoreALM was also providing application lifecycle management services to Johnson Controls as a subcontractor for IMPRIVA, a Johnson Controls contractor. In mid-August 2014, Labinot Bytyqi, CoreALM's president, learned of Keen Fusion's engagement with Ernst & Young and Johnson Controls. Bytyqi sent Williams an email informing him that Johnson Controls was a CoreALM account and that CoreALM had "asked many time[s] to bring you here." Williams responded that the Warner Brothers project was the only project

3

CoreALM had asked him to join. Williams also stated: "We've been trying to find an opportunity to collaborate for over a year so I can assure you that I was unaware of the landscape at [Johnson Controls] or your intentions to bring me on. Also, the specific details of the role were not revealed until after I was submitted through a recruiter. Please know that my intentions would never be to take work away from a CoreALM account."

Bytyqi testified that, after learning of Keen Fusion's agreement to provide consulting services to Johnson Controls through a subcontract with Ernst & Young, he contacted Akita Chen at Ernst & Young and told her that Keen Fusion had a contract with CoreALM and that CoreALM had previously "submitted Williams" for the position he was now taking through eCommQuest. According to Bytyqi, he told Chen that Keen Fusion had a contract with CoreALM and that Chen understood him to mean that the contract prohibited Keen Fusion from doing work for Johnson Controls through any avenue other than CoreALM. Bytyqi testified that he offered Ernst & Young the opportunity to retain Keen Fusion's services through CoreALM. Bytyqi also sent an email to Chen attaching a copy of the BSA and the NDA. Bytyqi testified that he talked to either Upton or Lisa Wilcox at eCommQuest about the Keen Fusion situation and that eCommQuest offered to split the fees generated by Keen Fusion's work for Johnson Controls, but that he refused that offer because he wanted to "follow the [BSA]."

On August 12, 2014, Chen sent an email to Wilcox at eCommQuest stating:

> Unfortunately, the client [Johnson Controls] has decided to not move forward with Nate Williams. Tim Earhart [IMPRIVA's president] has clearly stated that CoreALM believes that Nate would be in violation of the contract and they will pursue legal action if Nate takes the position via [Ernst & Young]. The team dynamics would not be conducive to collaboration under those circumstances.

4

The next day Upton at eCommQuest informed Williams that he would not be retained for the five-month consulting project at Johnson Controls.

Keen Fusion then filed suit against CoreALM alleging that CoreALM's actions constituted a breach of the BSA's Client Non-Competition provision. Keen Fusion also alleged that CoreALM tortiously interfered with Keen Fusion's business relationships with eCommQuest, Ernst & Young, and Johnson Controls. Keen Fusion also asserted a defamation cause of action, alleging that CoreALM made untrue statements to eCommQuest, Ernst & Young, and Johnson Controls that caused Keen Fusion to suffer damages.

After a two-day jury trial, CoreALM moved for a directed verdict arguing, in part, that Keen Fusion's tort claims were barred by the economic loss rule. The trial court denied the motion. The court then submitted to the jury a charge consisting of eight questions. Question 1 asked the jury, "Did CoreALM intentionally interfere with Keen Fusion's contract with eCommQuest, Inc. to become a subcontractor for Ernst & Young L.L.P. on an engagement for Johnson Controls, Inc.?" The jury answered "Yes" to this question. Question 2 asked the jury, "Did CoreALM fail to comply with the Bilateral Subcontract Agreement it entered into with Keen Fusion?" The jury answered "No" to this question. Question 3 asked the jury, "Did CoreALM disparage the business of Keen Fusion [by stating that] Keen Fusion was precluded from working on the Johnson Controls engagement pursuant to its agreement with CoreALM?" The jury answered "Yes" to this question. Question 4, which was predicated on an affirmative answer to Question 1, Question 2, or Question 3, asked the jury what sum of money would fairly and reasonably compensate Keen Fusion for its damages, measured by the amount Keen Fusion would have received for the Johnson Controls engagement. The jury answered "$116,509."

5

The trial court rendered judgment on the jury's verdict, denying CoreALM's motion for judgment notwithstanding the verdict. CoreALM's subsequent motion for new trial was overruled by operation of law. On appeal, CoreALM reurges its contention that the economic loss rule bars Keen Fusion's recovery on its tort claims and challenges the factual sufficiency of the evidence to support the jury's findings that CoreALM tortiously interfered with Keen Fusion's contract with eCommQuest and that CoreALM disparaged Keen Fusion's business.

**DISCUSSION**

We first consider whether the economic loss rule barred Keen Fusion's recovery of damages under its tort theories. The "economic loss rule" is a doctrine that consists of several limited rules that govern recovery of economic losses under certain circumstances. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011). The rule "is not generally applicable in every situation; it allows recovery of economic damages in tort, or not, according to its underlying principles." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235-36 (Tex. 2014). In broad terms, the doctrine addresses efforts to use negligence and product liability claims as vehicles for recovery of economic losses. *See Sharyland*, 354 S.W.3d at 414-18. *Sharyland* emphasizes that shorthand references to "the" economic loss rule in the singular can be "something of a misnomer" because the term actually encompasses multiple concepts addressing efforts to recover particular economic losses in particular situations. *Id*. at 414-15.

Here, CoreALM relies on a particular rule included within the "economic loss rule" doctrine—specifically, that when a party seeks damages for breach of a duty created under contract, as opposed to a duty imposed by law, tort damages are unavailable. *See Jim Walter Homes, Inc. v.*

6

*Reed*, 711 S.W.2d 617, 617-18 (Tex. 1986) (when plaintiff asserts tort claim arising from contract, we must look to substance of cause of action, not manner in which it was plead, to determine type of action brought); *see also Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."). CoreALM argues that Keen Fusion cannot recover its economic damages through a tort claim because those damages arise out of the alleged breach of the BSA. Implicit in CoreALM's argument is the assumption that the duty not to interfere with Keen Fusion's contract with eCommQuest arose solely out of the BSA, and was not a duty imposed by law. We disagree.

The economic loss rule does not bar all tort claims arising out of a contractual setting. *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). A party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a benefit under that contract. *Id.* The Texas Supreme Court has recognized the right of a party to an existing contract to recover from a third party who tortiously interferes with the contract since 1903. *See Raymond v. Yarrington*, 73 S.W. 800, 804 (Tex. 1903) (upholding right of purchaser of business to recover from third party for inducing seller of business to breach noncompetition provision of contract of sale). The duty not to interfere with another's contractual relationship arises out of the law and is independent of any contractual relationship between the interfering party and the party whose contractual relationship with a third party has been interfered with. *See id.* ("If it be actionable for one to intermeddle in another's affairs, and thereby prevent him from making contracts, to the damage of his business, for a stronger reason it is actionable to induce the breach of a contract already made."). Thus, CoreALM's

7

duty not to interfere with Keen Fusion's contract with eCommQuest did not arise out of the BSA, but out of common law. Additionally, the damages Keen Fusion sought were the economic losses he suffered from not being able to perform the Johnson Controls engagement as anticipated by his contract with eCommQuest, not the economic loss of a benefit under the BSA. The record demonstrates that the damages awarded, $116,509, was an amount equal to the sum of the amount Williams testified Keen Fusion would make working for Johnson Controls ($116,160) and the amount Keen Fusion paid to purchase a workers compensation policy required by Johnson Controls ($349). Although CoreALM argues that those damages are equivalent to the damages Keen Fusion would have recovered under his claim that CoreALM breached the BSA, the fact remains that the tortious interference claim arose out of CoreALM's separate legal duty not to interfere with Keen Fusion's contract with eCommQuest. *See, e.g.*, *American Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) ("In a commercial relations tort, the fact that the damages are 'economic' does not mean that they may not be damages for the tort. The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed.").

CoreALM also asserts that the damages Keen Fusion sought were available through a claim that CoreALM breached the BSA and thus could not be recovered through a tort claim. *See Wansey v. Hole*, 379 S.W.3d 246, 248 (Tex. 2012) (economic loss rule precludes recovery on negligence claim when the loss is also subject of contract between parties). Specifically, CoreALM argues that an indemnification provision in the BSA was designed to cover the economic damages

8

Keen Fusion sought to recover through its tort claims. As an initial matter, Keen Fusion did not contend that CoreALM breached the indemnification provision of the BSA. Rather, Keen Fusion alleged that CoreALM breached the Client Non-Competition provision by failing to "respect [Keen Fusion's] priority right of relationship with customers introduced by [Keen Fusion]." The jury did not find in Keen Fusion's favor on the breach of contract claim. Moreover, even had Keen Fusion sought to recover damages for breach of the indemnification provision, those damages would not compensate Keen Fusion for the loss of income it suffered as a result of losing the opportunity to perform the Johnson Controls engagement. The indemnification provision provides that each party shall indemnify the other the "fees payable to the indemnifying party in connection with Subcontract under which the obligations arose . . . ." Thus, the indemnification provision applies solely to "Subcontracts" entered into pursuant to the BSA, which is a "teaming agreement" designed to provide an agreement for "marketing, project delivery and other applicable activates [sic], *specifically involving the two companies working together*." (Emphasis added). The evidence at trial established that CoreALM and Keen Fusion never entered into any "Subcontract" governed by the BSA and no work was ever performed by either party under the BSA. The indemnification provision was inapplicable to the subject matter of Keen Fusion's suit, which was CoreALM's interference with its relationship with eCommQuest and the opportunity to perform services for Johnson Controls. We hold that the economic loss rule did not preclude Keen Fusion's recovery of damages pursuant to its tort claims and overrule CoreALM's first issue.

In its second issue, CoreALM asserts that there was factually insufficient evidence to support the jury's finding that CoreALM tortiously interfered with Keen Fusion's contract with

eCommQuest. In reviewing a factual-sufficiency challenge, we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We view the evidence in a neutral light. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We defer to the jury's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When, as here, a party attacks the factual sufficiency of an adverse finding as to an issue on which it did not have the burden of proof, we set aside the finding only if the evidence is so weak as to make the finding clearly erroneous and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

"A party alleging tortious interference must prove four elements to sustain its claim: (1) that a contract subject to interference exits; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

The parties do not dispute that Keen Fusion and eCommQuest had a contract pursuant to which Keen Fusion was to provide consulting services for a five-month period to Johnson Controls and would be compensated at the rate of $165 per hour.[2] Bytyqi testified that, after he learned that Keen Fusion would be working on a project for Johnson Controls, he contacted Chen at Ernst & Young and stated that CoreALM had a contract with Keen Fusion and that CoreALM had

---

[2] The jury charge did not include any questions or instructions regarding the existence of the contract as would be required if the issue was in dispute.

10

already submitted Williams's resume for consideration for a Johnson Controls project. Bytyqi agreed that Chen would have inferred from that statement that CoreALM's position was that Keen Fusion should not do work for Johnson Controls through a different avenue than CoreALM. Bytyqi testified that he offered to have Keen Fusion go through CoreALM for the Johnson Controls project based on CoreALM's status as "prime contractor" under the BSA. There was evidence that Bytyqi had several contacts with Ernst & Young and Johnson Controls in which he stated his objection to Keen Fusion's working on a Johnson Controls project through a contract with any entity other than CoreALM. It is undisputed that Bytyqi emailed Chen a copy of the BSA and the NDA, and that Tim Earhart with IMPRIVA was copied on the email. After those events, Chen at Ernst & Young informed eCommQuest that Johnson Controls had decided not to move forward with using Keen Fusion on the project because of its concern that certain threatened legal action by CoreALM to enforce the BSA would create "team dynamics" that "would not be conducive to collaboration." This evidence supports the jury's finding that CoreALM willfully interfered with Keen Fusion's contract with eCommQuest to perform a five-month project for Johnson Controls.

On appeal, however, CoreALM points to evidence that it submitted Williams's resume to Johnson Controls first, "entitling it to certain rights under the BSA." According to CoreALM, this evidence demonstrates that CoreALM was the "prime contractor" under the BSA and that the non-competition provision of the BSA prohibited Keen Fusion from competing with it with respect to the Johnson Controls engagement. CoreALM does not explain, however, nor can we discern, how this evidence tends to show that CoreALM did not interfere with Keen Fusion's contract with eCommQuest. Instead, it seems to be an attempt to show that CoreALM's actions with regard to the

11

Johnson Controls engagement were justified. Justification is an affirmative defense to tortious interference with contract. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A defendant may justify its actions "based on the exercise of either (1) [its] own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Id.* at 80. CoreALM did not, however, request a jury question on the defense of legal justification and, consequently, has waived any claim that its interference was not actionable because it was legally justified. *See* Tex. R. Civ. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.").

CoreALM also argues that evidence that Johnson Controls informed Bytyqi in September 2014 that it was, at that time, seeking to hire only permanent employees to perform the services that Keen Fusion was planning to perform on a five-month contract basis conclusively negates the element of proximate cause. However, as noted above, there was evidence that during the relevant time frame Johnson Controls decided not to pursue the five-month engagement with Keen Fusion due to concerns about the "team dynamics" given the controversy around Keen Fusion's engagement with Johnson Controls created by CoreALM. Moreover, Johnson Controls's decision to use a subcontractor to perform services for a five-month period is not inconsistent with a subsequent plan to make that position a permanent hire. On this record we cannot say that the evidence supporting the jury's finding that CoreALM interfered with Keen Fusion's contract with eCommQuest was so weak as to make that finding clearly erroneous and manifestly unjust.

In its second issue, CoreALM also asserts that the finding that it disparaged Keen Fusion's business is not supported by factually sufficient evidence. The judgment in this case was

12

not granted on a specific ground. Rather, the trial court rendered judgment on the jury's affirmative findings of both tortious interference with contract and business disparagement. When the judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid. *See EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 870 (Tex. App.—Dallas 2008, no pet.). Having concluded that the evidence was factually sufficient to sustain the trial court's judgment in favor of Keen Fusion's tortious interference with contract claim, we need not address CoreALM's challenge to the business disparagement claim. *See Barbarawi v. Ahmad*, No. 14-07-00790-CV, 2008 WL 2261433, at *4 & n.2 (Tex. App.—Houston [14th Dist.] May 27, 2008, no pet.) (mem. op.) (having concluded that tortious interference with contract claim supported trial court's judgment, appellate court need not address challenge to business disparagement claim). We overrule CoreALM's second issue.

## CONCLUSION

Having overruled CoreALM's two appellate issues, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed:   November 21, 2018

13